JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

NRO Boston, LLC; North River Outfitters; NRO Sport, LLC; NRO Edgartown, LLC, Jason Indelicato; and Alice Indelicato

## DEFENDANTS

Funding Metrics, LLC d/b/a Quick Fix Capital; David W. Frascella, Jr.; and Larry D. Frascella

**(b)** County of Residence of First Listed Plaintiff   Suffolk County, MA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Bucks County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Justin E. Proper, Shane R. Heskin, White and Williams LLP, 1650 Market St, Ste. 1800, Philadelphia, PA 19103, (215)864-7165

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec. 1332(a)(1)

Brief description of cause:
Plaintiffs seek relief, under Massachusetts law, from Defendants' collection of usurious loans

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
In excess of $5,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE   Hon. Douglas Wilkins (MA Superior Court)        DOCKET NUMBER 16-2522
Hon. Joseph Leighton (MA Superior Court)        DOCKET NUMBER 16-2523

DATE
11/6/2017

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| NRO Boston, LLC; North River Outfitters; | : | CIVIL ACTION |
| NRO Sport LLC; NRO Edgartown LLC; | : | |
| Jason Indelicato and Alice Indelicato | : | |
| v. | : | |
| Funding Metrics, LLC d/b/a Quick Fix | : | |
| Capital, David W. Frascella, Jr. and Larry D. | : | NO. |
| FrascellaX | | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)  Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.                    ( )

(b)  Social Security – Cases requesting review of a decision of the Secretary of Health        ( )
     and Human Services denying plaintiff Social Security Benefits.

(c)  Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d)  Asbestos – Cases involving claims for personal injury or property damage from           ( )
     exposure to asbestos.

(e)  Special Management – Cases that do not fall into tracks (a) through (d) that are          ( )
     commonly referred to as complex and that need special or intense management by
     the court. (See reverse side of this form for a detailed explanation of special
     management cases.)

(f)  Standard Management -- Cases that do not fall into any one of the other tracks.          (X)

| | | |
|---|---|---|
| 11/6/17 | Shane R. Heskin | _(signature)_ |
| **Date** | **Attorney-at-law** | **Attorney for Plaintiffs** |
| 215-864-6329 | 215-399-9603 | heskins@whiteandwilliams.com |
| **Telephone** | **Fax Number** | **E-mail Address** |

# UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 124-26 Charles Street, Boston, MA 02114; 4 Dock St., Edgartown, MA; 3 Oakdale, Boston, MA 02539

Address of Defendant: 884 Town Center Drive, Langhorne, PA 19047

Place of Accident, Incident or Transaction: Suffolk, MA
                                                      *(Use Reverse Side for Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a)).     Yes ☐   No ☒

Does this case involve multidistrict litigation possibilities?     Yes ☐   No ☒

*RELATED CASE IF ANY:*

Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in earlier numbered suit pending or within one year previously terminated action in this court?
                                                                                    Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                                                                                    Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
                                                                                    Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                                                                                    Yes ☐   No ☒

CIVIL: (Place ☒ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Security Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☒ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All Other Diversity Cases
    (Please specify) _____

# ARBITRATION CERTIFICATION
*(Check appropriate category)*

I, Shane R. Heskin _____, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 11/6/17 _____   Shane R. Heskin   201925
                              Attorney-at-Law   Attorney I.D. #

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 11/6/17 _____   Shane R. Heskin   201925
                              Attorney-at-Law   Attorney I.D. #

CIV. 609 (5/2012)

19923633v.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NRO BOSTON, LLC; NORTH RIVER OUTFITTERS; NRO SPORT, LLC; NRO EDGARTOWN LLC; JASON INDELICATO and ALICE INDELICATO<br><br>                              Plaintiffs,<br><br>      v.<br><br>FUNDING METRICS, LLC d/b/a QUICK FIX CAPITAL, DAVID W. FRASCELLA, JR. and LARRY D. FRASCELLA<br><br>                              Defendants. | Civil Action No.<br><br><br>**JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

## COMPLAINT AND DEMAND FOR A TRIAL BY JURY

Plaintiffs NRO Boston, LLC, North River Outfitters, NRO Sport, LLC, NRO Edgartown, LLC (collectively "NRO") and Alice Indelicato and Jason Indelicato (collectively " Plaintiffs"), by their attorneys, White and Williams LLP, as and for their and demand for a trial by jury, allege:

## NATURE OF THE ACTION

1.      This is an action to save a small Massachusetts business from financial ruin at the hands of Defendant Funding Metrics, LLC d/b/a Quick Fix Capital ("QFC") and its owners, David and Larry Frascella's (the "Frascella Brothers") predatory lending practices.

2.      Defendants, at the direction of the Frascella Brothers, engaged in an unlawful scheme whereby they have induced Plaintiffs to enter into and/or personally guarantee criminally

usurious loans that they knew Plaintiffs could not pay off without entering into subsequent loans, resulting in certain financial catastrophe.

3.      QFC is one of many Merchant Cash Advance ("MCA") companies that prey upon small businesses that are desperate and in need of quick cash.  These MCA companies advance funds to small businesses pursuant to so-called future account receivable purchase agreements or merchant cash advance agreements.  The terms and conditions of these agreements are wholly inaccurate, misleading and knowingly designed to disguise the true nature of the transaction in order to escape the criminal usury laws of various states.  When the small businesses cannot meet their obligations under these agreements, the MCA companies offer new advances under even more unconscionable terms.  Eventually, compliance with the terms becomes too oppressive, the small businesses default, and the MCA companies aggressively pursue the small businesses and their owners for repayment of the amounts due under the agreements, often employing threatening and illegal collection tactics.   In the end, the small businesses face certain financial ruin while the MCA companies recover not only the principle advanced, but also substantial fees and interest at rates that far exceed any interest rate permitted by applicable law.

4.      This predatory lending practice is equivalent to payday lending and is becoming a national epidemic that is threatening small businesses and their individual owners all over the country.

5.      As Bloomberg News reported, a new "subprime business lending" has emerged from the Financial Crisis: a multi-billion dollar industry that preys on unsophisticated small businesses.[1]  The MCA industry is "essentially payday lending for businesses.  It's a high-risk

---

[1] Ex. 1, Bloomberg, Wall Street Finds New Subprime with 125% Business Loans, dated May 22, 2014.

market, and interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[2]

6.     In the payday lending industry, once the consumer receives one loan, he/she often needs another loan just to repay his/her obligations under the first loan, thereby causing him/her to become trapped in a financially harmful, never-ending cycle of debt.  Indeed, the New York Attorney General and the New York State Department of Financial Services have each recognized "the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt and predatory collection practices," and have vowed "to protect New Yorkers from unscrupulous practices and [] oppose any attempt to evade New York's laws."  Ex. 3; *see also* Ex. 4 ("Although many of these companies profess to offer cash-strapped consumers much needed access to loans, they typically charge exorbitant interest rates that essentially force struggling consumers to roll over one payday loan into another and that trap consumers in a vicious, never ending cycle of high-cost borrowing that they can never repay.").

7.     The Attorney General of Massachusetts echoed the same public policy concern in bringing enforcement action against payday lenders:

> These companies targeted thousands of financially-stressed consumers in need of a loan, and charged exorbitant interest rates and fees, causing these consumers and their families to incur even greater economic strain….We are pleased to have worked with the Division of Banks in order to obtain significant restitution for consumers who were harmed, and permanently stop these lenders from doing business in Massachusetts.[3]

8.     MCA companies, such as QFC, are the commercial equivalent of payday lenders and their lending practices are similarly designed to trap small businesses in a debilitating, never-ending cycle of debt.   As recognized by the National Consumer Law Center, "[m]erchant cash advances operate very similarly to payday loans and have similar problems.  A lump sum of cash

---

[2] *Id*., Ex. 2, Bloomberg, Is OnDeck Capital the Next Generation of Lender or Boiler Room?, dated Nov. 13, 2014.
[3] *See id.*, Ex. 5.

is taken out as an advance on a borrower's future sales. The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account." Ex. 6.

9.      Often, the merchant does not have the cash flow necessary to make the daily payments and, like the victims of payday lenders, the recipient of a merchant cash advance is often forced to take out successive loans to repay its prior obligations. As reported by CNN, "[m]any business owners take out new advances in order to pay off outstanding balances on previous advances, plunging them into a cycle of debt." Ex. 7.

10.      "The problem is the advances aren't regulated by the government and the fees, penalties and rates aren't subject to any oversight." Ex. 7. This is because the terms of the MCA agreements are wholly inaccurate, misleading and knowingly designed by the companies to avoid the criminal usury laws.

11.      The National Consumer Law Center also has recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay. *See* Ex. 6. Like here, this is because these predatory lenders receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id.* ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

12.     Because of the predatory nature of these transactions, the small businesses ultimately cannot satisfy the usurious and oppressive terms of these loans, they default, and the MCA companies quickly obtain judgments and attempt to liquidate the assets of the business and its owner(s) to repay the outstanding amounts due under their agreements, often using the threatens of further economic loss or personal embarrassment to extract payouts.  At this point, however, the principle amounts of the advances have long been repaid and the MCA companies destroy the small businesses to solely collect upon usurious interest rates and high fees charged under the successive loans.  As one small business protection advocate has put it, MCAs are "*in the business of helping [small] businesses fail.*"  Ex. 1.

13.     Like others within the MCA industry, QFC is the commercial equivalent of a payday lender.  It preys on the weak and desperate and extorts unconscionable terms that are expressly prohibited by the criminal laws, civil statutes, and the strong public policy of Massachusetts.

14.     Plaintiffs are a victim of this scheme.

15.     QFC was more than happy to pile on along with the other MCA companies who were preying on NRO.

16.     QFC entered into thirteen different loan transactions with NRO with interest rates ranging from 364% to 1,056%.

17.     Loan proceeds from one loan were regularly used to pay off prior loans until the house of cards ultimately collapsed.

18.     QFC knew that NRO's business would inevitably fail if NRO continued to make the required daily payments as many of the loan agreements purported to purchase *over 100% of NRO's gross receivables*.

19.     Because of the illegal and unconscionable terms of these loans, there was not enough money coming in the door to make the daily payments to QFC, much less pay operating expenses which QFC knew also included payments to other MCA companies.

20.     QFC knew that its loans and the loans from other MCA companies were unsustainable.

21.     In fact, at the end the pyramid scheme with which Defendants knowingly participated, NRO was required to make daily payments of approximately $50,000 to QFC and other MCA companies.

22.     Defendants were not concerned about NRO defaulting under the agreements because the agreements give it every possible protection, including security agreements, personal guarantees and confessions of judgments (which happen to be illegal in Massachusetts).

23.     This action seeks monetary damages for Defendants' knowing and intentional violation of Massachusetts' usury and consumer protection laws.

## THE PARTIES

24.     Plaintiff NRO Boston, LLC is a Massachusetts corporation with its principal place of business located at 124-26 Charles Street, Boston, Massachusetts 02114. Each of its LLC members is a citizen of Massachusetts.

25.     Plaintiff North River Outfitters is a Massachusetts corporation with its principal place of business located at 124-26 Charles Street, Boston, Massachusetts 02114. Each of its LLC members is a citizen of Massachusetts.

26.     Plaintiff NRO Sport, LLC is a Massachusetts corporation with its principal place of business located at 124-26 Charles Street, Boston, Massachusetts 02114. Each of its LLC members is a citizen of Massachusetts.

27.     Plaintiff NRO Edgartown, LLC is a Massachusetts corporation with its principal place of business located at 4 Dock Street, Edgartown, Massachusetts 02539.  Each of its LLC members is a citizen of Massachusetts.

28.     Plaintiffs Alice and Jason Indelicato are individuals who are citizens of Massachusetts and reside at 3 Oakdale Boston, MA  02539.

29.     Defendant QFC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with a registered fictitious name of Quick Fix Capital, with its principal place of business located at 884 Town Center Drive, Langhorne, PA 19047.

30.     Upon information and belief, each of Defendant QFC's LLC members is a citizen of Pennsylvania.

31.     David W. Frascella is the Chairman and co-founder of QFC.

32.     David Frascella, upon information and belief, is a citizen of Pennsylvania residing at 5 Stonebridge Crossing Rd, Newtown, PA 18940.

33.     Larry D. Frascella is the owner and co-founder of QFC.

34.     Larry Frascella, upon information and belief, is a citizen of Pennsylvania residing at 130 Forrest Creek Ct, Feasterville Trevose, PA 19053.

## JURISDICTION AND VENUE

35.     This Court has original jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

36.     The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §§ 1332 & 1367(a).

37.     Defendants are subject to the personal jurisdiction of this Court because they are physically present in Pennsylvania, and regularly transact business in Pennsylvania.

38.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Pennsylvania.

## FACTS COMMON TO ALL COUNTS

39.     NRO is a clothing and sports retailer with locations in Beacon Hill, Martha's Vineyard, Nantucket and Wellesley.

40.     It is owned by Alice and Jason Indelicato, who are husband and wife, and have lived in Massachusetts the majority of their life.

41.     NRO and its individual owners have been victimized by a group of predatory lenders that have routinely and systematically taken advantage of them for years, slowly devastating an otherwise profitable business that has employed dozens of Massachusetts residents for nearly a decade.

42.     NRO and its owners are not alone.

43.     Numerous other Massachusetts small businesses and citizens have similarly been victimized by the same predatory scheme.

44.     QFC and its owners, the Frascella Brothers, are the commercial equivalent of payday lenders.

45.     Defendants prey on the weak and desperate and extort unconscionable terms that are expressly prohibited by the criminal laws, civil statutes, and the strong public policy of this Commonwealth.

46.     The Frascella Brothers have a long career of using a variety of shams and ruses, including a "rent-a-bank scheme" with a prior payday lending business, to cloak illegal lending activities that violate state usury laws.

47.     With increased regulatory scrutiny and consumer lawsuits filed against payday lenders, the Frascella Brothers closed their illegal Pennsylvania payday lending business and turned their sights to a new criminal venture – usurious loans to small businesses.

48.     The loans are illegal because the Defendants are charging interest rates to small businesses that are 25 to 50 times greater than the maximum amount permitted by states like Massachusetts.

49.     Defendants are not a bank or thrift chartered under the laws of the United States.

50.     Defendants are not a bank chartered under the laws of any state and insured by the Federal Deposit Insurance Corporation.

51.     Defendants are completely unregulated.

52.     Defendants make the following representation on their website:

> As a leading business cash advance provider, we can offer funding when our competitors would decline, why? Because our superior underwriting allows us to identify solid businesses that other providers fail to recognize. Quick Fix Capital understands the role innovation and technology play in alternative finance. While most of our competitors require business owners to spend hours assembling and sending reams of documents, Quick Fix Capital requires much less paperwork. Instead we score each application primarily using the many available online data sources.

https://www.quickfixcapital.com/about_us

53.     Defendants further represent that:

> At Quick Fix Capital we know that every business is unique. No one understands your company's funding needs as well you do. Quick Fix Capital analyzes merchant requests individually and on their own merits to offer financing that best satisfies their

requirements and goals. We are able to present business owners
with more and better options than our competition.

https://www.quickfixcapital.com

54.     These representations are knowingly false.

55.     Defendants do not care whether the businesses can afford to make the payments
or not.

56.     Defendants did not offer financing based on NRO's requirements or goals.

57.     Providing loans with interesting rates ranging from 364% to 1,056% did not help
NRO.

58.     Defendants did not do any underwriting to ensure that NRO could repay the loans.

59.     Defendants only cared about making as much money as possible on NRO by
charging obscene interest rates to businesses in need of working capital that cannot obtain
traditional financing.

60.     Defendants know or should know that their illegal business model will lead to
businesses failing, which they safeguard against through security agreements, personal
guarantees and confessions of judgment.

61.     Defendants know all too well that the transactions are illegal in those states that
have usury laws with respect to commercial loans.

62.     Defendants attempt to legitimize the transaction through subterfuge.

63.     Defendants label the transactions as the purchase and sale of receivables by using
a common instrument that purports to be a "factoring agreement."

64.     The NRO agreements (which are unconscionable contracts of adhesion), however,
lack all of the hallmarks of a true "factoring agreement."

65.     Rather, the NRO agreements are, in truth, nothing more than a series of collateralized loans provided at unconscionably high interest rates.

66.     As long held by the Massachusetts Supreme Judicial Court, Defendants' attempts to disguise the true nature of these transactions will not be tolerated:

> Usury does not consist in the intent with which parties take or pay unlawful interest. It is the transaction to which the law looks, in order to ascertain whether it is usurious or otherwise. The prohibition of the statute embraces every contract or assurance for the payment of money with interest at a greater rate than is allowed by law, irrespective of the motive or intent of the parties in making it. Whatever form or disguise the dealing of the parties may assume, it will be deemed usurious if in effect it is a loan of money at an unlawful rate of interest.

67.     *Sylvester v. Swan,* 87 Mass. (5 Allen) 134 (1862); *Hopkins v. Flower*, 256 Mass. 367, 372 (1926) ("[N]o device intended to cover up the real character of the transaction can ever avail to defeat the [usury] statute.").

### The So-Called "Factoring Agreements" are Disguised Loans

68.     While QFC's agreements purport to purchase future receivables based on a specified percentage of NRO's daily receivables and even contain self-serving language that the agreement is not a loan, this language cannot save QFC from Massachusetts' usury laws.

69.     It is the true nature of the transaction, not what QFC self-servingly calls the transaction that Massachusetts courts use to determine whether the agreement is a loan or a sale.

70.     QFC's agreements lack all of the hallmarks of a true "factoring agreements," and thus, are collateralized loans at illegally high and unconscionable interest rates. The QFC agreements actually provide that NRO is selling, assigning and transferring ***all of its future accounts***, contract rights and other obligations to QFC in consideration for the "Purchase Price."

71.     But the agreements provide that NRO must repay the "Purchased Amount" by making fixed daily payments which are purportedly based on a "Purchase Percentage."

72.     If the transactions were really sales (which they are not), QFC would have known that it could not purchase all of NRO's receivables because it knew that NRO had agreements with other MCA companies where it already sold a percentage of its receivables.

73.     Further, unlike a true sale of receivables, the risk of loss associated with the purchased receivables was not transferred to QFC.

74.     A default is declared, under Section 3.12, if "(a) Seller interferes with the Buyer's right to collect the current payment due (and any payment for arrears, if any) in violation of this Agreement; (b) Seller violates any term or covenant in this Agreement; (c) Any representation or warranty by Seller in this Agreement is incorrect, false or misleading in any material respect when made; (d) Seller admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or any proceeding is instituted by or against Seller to adjudicate it bankrupt or seeking reorganization, arrangement, adjustment or composition of its debts; … (f) seller transports, moves, interrupts, suspends, dissolves or terminates its business…"

75.     It is an express term of the QFC agreements to make the daily payment and to repay the full "Purchased Amount."

76.     The QFC agreements also state that "[a]fter **three (3)** consecutive NSF's the Merchant will be in default and the default fee shall be accessed (sic)."  Addendum to the NRO Edgartown Agreement, dated, 10/27/2015 (emphasis in the orginal).

77.     The default fee is twenty **(20%) percent** of the original advanced amount or **$5,000**, whichever is greater.  *See id.* (emphasis in the original).

78.     Not even bankruptcy or the business having to close for fire or natural disaster would transfer the risk of loss to QFC.

79.     NRO had an unconditional obligation under the QFC agreements to make the fixed daily payment and to repay "Purchased Amount" whether it generated receivables or not.

80.     The QFC agreements are not a "true sale" when Defendants included contractual language where they have full recourse against the Plaintiffs if there are no receivables available to make the daily payment.

81.     In the event of any one of these defaults, Defendants are then permitted to immediately seize the business assets secured under the Security Agreement as well as the personal assets of NRO's private business owners under the Personal Guarantee.

82.     Even more outrageous, under a vast majority of the agreements, Defendants are permitted to obtain a Judgment by Confession without even notifying Plaintiffs—which is illegal in Massachusetts.

### The QFC Agreements With NRO Boston

83.     From May 2015 to July 2016, Plaintiff NRO Boston entered into a series of nine (9) loans with Defendant QFC.  NRO was required to turn over all of its passwords and bank information at the inception of these agreements.

84.     Beginning on May 18, 2015, NRO Boston entered into an agreement (the "May 2015 Agreement") with QFC in which it purportedly sold $107,250 of future receivables for $75,000.

85.     The "Purchase Percentage" [4] of daily receivables for the May 2015 Agreement was 10.84%, but the fixed daily payment [5] required Plaintiffs to make 99 daily payments of $1,083.33.

---

[4] The "Purchase Percentage" was supposedly a percentage of a merchant's daily receivables that was to be turned over to QFC pursuant to the terms of the purported "factoring agreement."

86.     The effective annual interest rate for the May 2015 Agreement was at least 592%.

87.     The subsequent agreements that NRO entered into with Defendant QFC were substantially similar to that May 2015 Agreement.

88.     On June 22, 2015, NRO Boston entered into an agreement (the "June 2015 Agreement") with QFC in which it purportedly sold $91,650 in future receivables for $65,000.

89.     The June 2015 Agreement provided that the "Purchase Percentage" was 25.72%, but the fixed daily payment required NRO Boston to make 99 daily payments of $925.76.

90.     The effective annual interest rate for the June 2015 Agreement was at least 540%.

91.     On July 15, 2015, NRO Boston entered into an agreement (the "July Agreement") with QFC in which it purportedly sold $214,500 in future receivables for $150,000 (including $62,833.47 for an existing balance payoff).

92.     The July 2015 Agreement provided that the "Purchase Percentage" was 62.86%, but the fixed daily payment required NRO Boston to make 99 daily payments of $2,166.67.

93.     The effective annual interest rate for the July 2015 Agreement was at least 592%.

94.     On August 20, 2015, NRO Boston entered into an agreement (the "August 2015 Agreement") with QFC in which it purportedly sold $214,500 in future receivables for $150,000 (including $52,768.08 for an existing balance payoff).

95.     The August 2015 Agreement provided that the "Purchase Percentage" was 44.25%, but the fixed daily payment required NRO Boston to make 110 daily payments of $1,950.00.

---

[5] The daily payment was a fixed payment determined by Defendant QFC that NRO Boston were required to pay for a finite number of days and bore no relationship to NRO Boston's daily receivables.

96.    The effective annual interest rate for the August 2015 Agreement was at least 456%.

97.    On September 28, 2015, NRO Boston entered into an agreement (the "September 2015 Agreement") with QFC in which it purportedly sold $307,450 in future receivables for $215,000 (including $103,999.89 for an existing balance payoff).

98.    The September 2015 Agreement provided that the "Purchase Percentage" was 12%, but the fixed daily payment required NRO Boston to make 99 daily payments of $3,105.56.

99.    The effective annual interest rate for the September 2015 Agreement was at least 592%.

100.    On December 10, 2015, NRO Boston entered into an agreement with QFC in which it purportedly sold $138,000 in future receivables for $100,000.

101.    The December 10, 2015 Agreement provided that the "Purchase Percentage" was 28.47%, but the fixed daily payment required NRO Boston to make 110 daily payments of $1,254.55.

102.    The effective annual interest rate for the December 10, 2015 Agreement was at least 364%.

103.    On January 15, 2016, NRO Boston entered into an agreement (the "January 2016 Agreement") with QFC in which it purportedly sold $531,749 in future receivables for $371,852 (including $171,852.57 for an existing balance payoff).

104.    The January 2016 Agreement provided that the "Purchase Percentage" was **99.73%**, but the fixed daily payment required NRO Boston to make 121 daily payments of $4,394.62.

105.   The effective annual interest rate for the January 2016 Agreement was at least 367%.

106.   On April 19, 2016, NRO Boston entered into an agreement (the "April 2016 Agreement") with QFC in which it purportedly sold $214,500.00 in future receivables for $150,000.00.

107.   The April 2016 Agreement provided that the "Purchase Percentage" was 10.16%, but the fixed daily payment required NRO Boston to make 110 daily payments of $1,950.00.

108.   The effective annual interest rate for the April 2016 Agreement was at least 456%.

109.   On July 7, 2016, NRO Boston entered into an agreement (the "July 2016 Agreement") with QFC in which it purportedly sold $286,000 in future receivables for $200,000 (including $107,250.00 for an existing balance payoff).

110.   The July 2016 Agreement provided that the "Purchase Percentage" was 11.64%, but the fixed daily payment required NRO Boston to make 121 daily payments of $2,363.64.

111.   The effective annual interest rate for the July 2016 Agreement was at least 367%.

112.   NRO Boston made all required payments starting on or around May 2015 until August 2016 when one of its MCA companies, Saturn Funding, used its full recourse protections by freezing NROs business accounts.

### The QFC Agreements With NRO Edgartown

113.   NRO Edgartown is a seasonal business that only operates from May to October.

114.   QFC nevertheless entered into agreements with NRC Edgartown during months in which it was not even open for business.

115.   NRO Edgartown was used as a front to disguise the real borrower—NRO Boston.

116.    In each of the below transactions, NRO Edgartown was the name on the loan, but the proceeds were taken out of NRO Boston's accounts.

117.    QFC's transactions with NRO Edgartown were down to obtain greater security when NRO ultimately defaulted because it knew other MCA companies were simultaneously preying on NRO.

118.    From October 2015 to June 2016, Plaintiff NRO Edgartown entered into a series of four (4) loans with QFC.  NRO Edgartown was required to turn over all of its passwords and bank information at the inception of these agreements.

119.    On October 27, 2015, NRO Edgartown entered into an agreement (the "October 2015 Agreement") with QFC in which it purportedly sold $83,400 in future receivables for $60,000.

120.    The October 2015 Agreement provided that the "Purchase Percentage" was 34.75%, but the fixed daily payment required NRO Edgartown to make 66 daily payments of $1,263.63.

121.    The subsequent agreements that NRO Edgartown entered into with QFC were substantially similar to that October 2015 Agreement.

122.    The effective annual interest rate for the October 2015 Agreement was at least 1,056%.

123.    On December 24, 2015, NRO Edgartown entered into an agreement with QFC in which it purportedly sold $117,450 in future receivables for $81,000 (including $32,854.80 for an existing balance payoff).

124.    The "Purchase Percentage" for the December 24, 2015 Agreement was 44.94%, but the fixed daily payment required Plaintiff NRO Edgartown make 99 daily payments of $1,186.36.

125.    The effective annual interest rate for the December 24, 2015 Agreement was at least 648%.

126.    On February 23, 2016, NRO Edgartown entered into an agreement (the "February 2016 Agreement") with QFC in which it purportedly sold $261,690 in future receivables for $183,000 (including $66,436.52 for an existing balance payoff).

127.    The February 2016 Agreement provided that the "Purchase Percentage" was **156.25%**, but the fixed daily payment required NRO Edgartown to make 110 daily payments of $2,379.00.

128.    QFC actually contracted to debit every business day from NRO Edgartown's account more receivables than NRO Edgartown generated, which again shows that this transaction was a sham sale.

129.    The February 2016 Agreement illustrates that QFC was actively participating and/or was complicit in the pyramid scheme being perpetrated by many of the major players in the MCA industry against NRO.

130.    The effective annual interest rate for the February 2016 Agreement was at least 456%.

131.    On June 7, 2016, NRO Edgartown entered into an agreement (the "June 2016 Agreement") with QFC in which it purportedly sold $286,000.00 in future receivables for $200,000.00 (including $88,023 for an existing balance payoff).

132.    The June 2016 Agreement provided that the "Purchase Percentage" was *114.40%*, but the fixed daily payment required NRO Edgartown to make 110 daily payments of $2,600.00.

133.    The effective annual interest rate for the June 2016 Agreement was at least 456%.

134.    NRO Edgartown made all required payments starting on or around May 2015 until August 2016 when one of its MCA companies, Saturn Funding, used its full recourse protections by freezing NROs business accounts.

**QFC Knew That Its Loans Transactions With NRO Doomed NRO To Fail**

135.    Even without the involvement of other MCA companies, QFC knew that there was no way that NRO could repay the loans with its own revenue.

136.    QFC took *99.73%* of every dollar NRO Boston generated in January 2016, *156.25*% of every dollar NRO Edgartown generated in February 2016, and *114%* of every dollar NRO Edgartown generated in June 2016.

137.    There was no money left for NRO to pay its expenses.

138.    QFC therefore knew that NRO Boston could not repay the loans without defaulting or entering into new loans to pay off these loans and the other MCA loans.

139.    Even worse, Defendants knew or should have known from NRO's bank statements, which were submitted in connection with each loan transaction and/or which QFC was given access to as a requirement of each loan, that NRO was required to make payments to other MCA companies at the time they was lending money to NRO.

140.    For example, Yellowstone issued a series of purported "factoring agreements" over the course of just five months. Each daily payment amount was allegedly based on 15% of NRO's daily future receivables. The specified daily payment for each of these transactions,

however, varied from $973 to $6,995 in proportion to the amount of the loan, not the so called "good-faith" estimate of what would be 15% the merchant's daily receivables:

| | | | | | Daily $ | Daily% |
|---|---|---|---|---|---|---|
| NRO Boston | Yellowstone Capital | 2/23/2016 | 100,000 | 145,900 | 1,621 | 15% |
| NRO Edgartown | Yellowstone Capital | 3/11/2016 | 60,000 | 87,540 | 973 | 15% |
| NRO Boston | Yellowstone Capital | 3/28/2016 | 210,000 | 306,390 | 3,064 | 15% |
| NRO Edgartown | Yellowstone Capital | 5/17/2016 | 100,000 | 145,900 | 3,316 | 15% |
| NRO Boston | Yellowstone Capital | 5/17/2016 | 250,000 | 364,750 | 1,327 | 15% |
| NRO Edgartown | Yellowstone Capital | 6/16/2016 | 335,000 | 499,990 | 5,995 | 15% |
| NRO Boston | Yellowstone Capital | 6/29/2016 | 270,000 | 409,738 | 3,499 | 15% |
| NRO Boston | Yellowstone Capital | 7/26/2016 | 400,000 | 699,950 | 6,995 | 15% |
| NRO Edgartown | Yellowstone Capital | 7/27/2016 | 400,000 | 699,950 | 6,995 | 15% |

141.    As a matter of law, QFC cannot purchase receivables that already had been sold, proving that all of the transactions by it and the other MCA companies with NRO were loans.

142.    There could not be any clearer evidence that QFC's purported purchase of more receivables than NRO was expected, or could have reasonably been expected to generate, was a sham.  Indeed, it is impossible to purchase greater than 100% of a business' receivables.

143.    QFC also knew full well that by taking part, either directly or indirectly, in the pyramid scheme with the other MCA companies that NRO was doomed to fail or default.

144.    After QFC took its daily payment, it was literally impossible for NRO to continue to pay its expenses.

145.    This left NRO with no viable options. It could either continue to take out additional loans to payoff existing loans or it could cease operations, which is an event of default subjecting the owners to personal liability.

146.    Either way, QFC had full recourse to recover its monies, which it did by filing confessions of judgment in New York against NRO and NRO Edgartown.

147.    Incredibly, QFC publicly touts its services as "Intelligent Business Decisioning."

148.    There was nothing intelligent about NRO having to incur a vicious cycle of spiraling debt so that it could continue to make usurious payments to QFC and the other MCA companies with whom QFC was complicit.

### Defendants Violated Massachusetts Law and Their Attempt to Contract Around its Usury Laws Is Not Permitted In This Circuit

149.    The Defendants' agreements contain Pennsylvania choice-of-law and Pennsylvania venue provisions.

150.    The law in this Circuit is clear that the contractual choice-of law provision designating Pennsylvania will not be applied where the application would violate the fundamental policy of another State, which in this case it does.

151.    QFC's agreements with Plaintiffs violated Mass. Gen. L. ch. 271, § 49.

152.    The title of the statute is Criminal Usury, which is a felony punishable up to ten years in state prison.   Moreover, this criminal statute is contained within Chapter 271 of Massachusetts General Laws, titled "Crimes Against Public Policy."

153.    Nor can Defendants use a choice-of-law provision to contract around the laws of Plaintiffs' residence, which laws Defendants knew they were violating by charging interest rates ranging between 364% and 1056%.   *See Cashcall, Inc. v. Mass. Div. of Banks,* 3 Mass. L. Rep. 5 (Mass. Super. Ct. 2015) (holding that Massachusetts criminal usury laws applied to out-of-state resident despite choice-of-law provision because "[a]ll of the loans were applied for, paid from, and collected from Massachusetts.").

154.    Among other unconscionable business practices, each of the  Defendants has knowingly and intentionally violated Mass. Gen. Law ch. 271, § 49 by charging outrageous interest rates on loans that are several times the 20% maximum interest rate permitted under the criminal laws of this Commonwealth.

155.    A violation of this Commonwealth's criminal usury law is not a minor infraction; it is a felony punishable up to ten years in state prison.

156.    It is also a felony to even possess the instrument.

157.    As the Attorney General of Massachusetts has advised, usury is:

offensive, detrimental and injurious to the life, health and general welfare of the borrowers and their families," in that it diverts a large percent of the borrowers' incomes from "otherwise beneficial directions," and materially reduces their ability to obtain the social and economic benefits which their incomes would normally secure to them. Said activities breed strife and unrest ***and cause the borrower in his extremity to go to others engaged in the same unlawful activities***, further depriving himself and his family of the necessities of life and resulting in emotional and mental distress affecting the borrower's performance as an employee and ***adding to the relief rolls***. Said business is obnoxious and detrimental to retailers of goods who serve the borrowers and their families because the excessive interest reduces the sum available to pay for supplies furnished. ***Because of these effects on many hundreds of persons the Defendants' activities are contrary to the good morals, public peace and general welfare of the people and contrary to the public policy of the Commonwealth***. The majority of the borrowers are humble citizens, ignorant of the law, and their legal rights against the Defendants are inadequate and ineffective. They have no means to defend themselves. There is thus presented, the bill alleges, "an intolerable situation" that cannot be remedied, except by relief in equity.

*Commonwealth v. Stratton Finance Co.*, 38 N.E.2d 640, 641-42 (Mass. 1941) (emphasis added).

158.    Every one of these concerns has materialized in this case.

159.    The criminally usurious nature of these transactions constitutes a per se violation of Massachusetts' consumer protection statute (Mass. Gen. Law ch. 93A) and the use of purported "factoring agreements" demonstrates the willful intent necessary to treble the damages.

160.    As a further demonstration of their unfair and deceptive practices, QFC included other unconscionable and unfair provisions in their contracts of adhesion to further intimidate their victims from seeking the statutory and constitutional protections of Massachusetts.

161.    Among other things, QFC included provisions requiring their victims to waive: (1) the legal protections and jurisdiction of Massachusetts; (2) their constitutional right to a jury trial; and (3) their right to participate in a class action.

162.    There are also myriad other punitive default provisions that have been declared unlawful by the Massachusetts Supreme Judicial Court.

163.    Each of these provisions is unenforceable because, among other reasons, they offend the strong public policy of Massachusetts.

164.    By requiring Plaintiffs to execute a confession of judgment within Massachusetts's borders, through a Massachusetts notary public, QFC also violated Mass. Gen. L. ch. 231, 13A, which provides that "any stipulation . . . in a promissory note . . . whereby a party thereto agrees to confess judgment . . . or agrees to authorize another person to confess judgment . . . shall be void." This is likewise a per se violation of Mass Gen. Law ch. 93A.

165.    The extortionate terms of these loans are also a *per se* violation of 93A because they require NRO and its individual owners to waive service of process in violation of Mass. Gen. L ch. 231, § 13A:

> Any judgment entered in an action upon a contract, promissory note or other instrument in which or in a memorandum or writing relating to which is contained a stipulation, whereby the defendant in such action waived or agreed to waive or authorized another person to waive or agree to waive the issue or service of process in such an action shall be set aside or vacated on motion of the defendant, unless it appears that service in the usual manner was had upon him or that the plaintiff sent to him by registered mail at least seven days before the entry of such action a notice of his intention to enter the same on said day and at the time of entry filed an affidavit of giving notice as aforesaid, which affidavit shall be prima facie evidence of the giving thereof.

166.    Every one of these confessions of judgment was executed in Massachusetts, by Massachusetts residents and businesses, through a Massachusetts notary.

167.   In fact, QFC actually filed and obtained confessions of judgment against NRO and NRO Edgartown in New York.

## DAMAGES

168.   The predatory scheme commenced with a single predatory loan, which led to additional loans—one after another—to pay off the prior loans.

169.   NRO was essentially trapped by a common tactic used by these predatory lenders, which begins with a criminally usurious starter loan and ends in financial catastrophe.

170.   Defendants knew of the existence of these other disguised loans and nevertheless continued to loan monies to Plaintiffs, knowing that the proceeds of one loan would be used to pay off monies owed on another and so on and forth until NRO could no longer afford to make any further payments.

171.   For example, NRO entered into a continuous series of criminally usurious loans with Merchant Cash & Capital between March 16, 2010 and March 20, 2013. *See* Ex. 8.

172.   As a direct and proximate cause of the financial strain resulting from this series of transactions with Merchant Cash & Capital, NRO was forced to enter into another series of criminally usurious loans with Kalamata between December 18, 2013 and May 9, 2016. *See* Ex. 8.

173.   As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into two criminally usurious loans with IOU on September 24, 2013 and October 29, 2014. *See* Ex. 8.

174.   As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into another series of criminally usurious loans with CapCall between December 19, 2014 and June 20, 2016. *See* Ex. 8.

175.    As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into another series of criminally usurious loans with Funding Metrics between May 18, 2015 and July 7, 2016.  *See* Ex. 8.

176.    As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into three criminally usurious loans with QFC on October 22, 2015, April 26, 2016 and May 18, 2016.  *See* Ex. 8.

177.    As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into another series of criminally usurious loans with Richmond Capital between January 8, 2016 and July 28, 2016.  *See* Ex. 8.

178.    As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into three criminally usurious loans with TVT Capital on February 17, 2016, May 2, 2016 and July 19, 2016.  *See* Ex. 8.

179.    As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into another series of criminally usurious loans with Yellowstone and its sister company Arch Capital between February 3, 2016 and July 28, 2016.  *See* Ex. 8.

180.    As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into three criminally usurious loans with Express Business Funding on March 2, 2016, March 5, 2016, and June 21, 2016.  *See* Ex. 8.

181.    As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into another series of criminally usurious loans with Saturn Funding between April 8, 2016 and July 12, 2016.  *See* Ex. 8.

182.    As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into a criminally usurious loan with Yes Funding on May 23, 2016.  *See* Ex. 8.

183.   As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into two criminally usurious loans with ACE Funding on June 10, 2016 and July 11, 2016.  *See* Ex. 8.

184.   As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into a criminally usurious loan with IMS Fund on June 29, 2016.  *See* Ex. 8.

185.   As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into a criminally usurious loan with Wise Funding on July 18, 2016.  *See* Ex. 8.

186.   As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into a criminally usurious loan with Empire Funding on July 25, 2016.  *See* Ex. 8.

187.   As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into a criminally usurious loan with ML Factors on August 2, 2016.  *See* Ex. 8.

188.   As a direct and proximate result of each of these loans, NRO paid interest in excess of the 20% maximum interest rate permitted by Massachusetts law.

189.   As a direct and proximate result of each of these loans, NRO paid also interest in excess of the 25% maximum interest rate permitted by New York law.

190.   As a direct and proximate result of each of these loans, NRO's business assets have been frozen, its employees and owners have been harassed, and NRO has had to defend numerous lawsuits as a result of certain Defendants' attempts to collect upon an unlawful debt.

191.   Defendants' knowledge of the other loans and participation, directly or indirectly, in the vicious cycle of predatory lending created an indivisible injury for which Defendants are responsible.

192.   As a direct and proximate result of each of these loans, NRO suffered indivisible injury through loss of goodwill, lost profits, and devaluation of its business.

193.    As a direct and proximate result of each of these loans, NRO suffered indivisible injury by having its other business loans being called in from legitimate banks, deterioration of its credit profile, and the inability to secure financing to obtain needed inventory and pay its vendors.

194.    As a direct and proximate result of each of these loans, Alice Indelicato has suffered indivisible injury through severe mental anguish and emotional distress.

195.    In addition to being harassed by Defendants' unlawful actions, the Indelicato's have had liens placed on their residential home and have had their personal assets frozen.

196.    Defendants' unlawful conduct has caused tremendous "emotional and mental distress" to the individual owners of NRO because all of their personal assets, including their homestead, are at risk of seizure and foreclosure because Defendants' have extorted personal guarantees as a result of their criminally usurious loans.

197.    Unfortunately, these are not mere threats; it is a nightmare turned into reality.

198.    As a direct result of Defendants' unlawful conduct, NRO and its individual owners have been besieged by lawsuits in Massachusetts and other jurisdictions, resulting in personal judgments by confession (which are illegal in Massachusetts), bank accounts being frozen, and liens on their homes.

199.    As a direct and proximate result of each of these loans, the Indelicato's have also suffered an indivisible injury by having to drain all of their personal assets by providing personal and family loans to NRO in order to keep their only means of livelihood afloat.

200.    Because each of these transactions involves a criminally usurious loan, NRO is entitled to a declaration that each loan and its supporting documents are void.

201.    In addition, NRO is entitled to recover the over $5 million in criminally usurious interest that has been procured by Defendants, as well as its attorney's fees, and costs of this suit.

202.    In order to deter Defendants from committing these same crimes against future victims within this Commonwealth, Plaintiffs are also entitled to treble damages under 93A.

203.    As recognized by the Supreme Judicial Court of Massachusetts, the unscrupulous tactics employed by Defendants against Plaintiffs are exactly what the criminal usury laws were designed to prevent.  *See Begelfer v. Najarian*, 409 N.E.2d 167, 171 (Mass. 1980) ("The law is designed to protect the necessitous debtor from outrageous demands by lenders.").

### COUNT I
### (Mass. Gen. Law ch. 93A §§ 2 and 11)

204.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein

205.    A corporate officer may be held personally liable for his "participation in unfair and deceptive practices." *Nader v. Citron*, 372 Mass. 96, 103, 360 N.E.2d 870 (1977); *The Community Builders, Inc. v. Indian Motocycle Associates, Inc.*, 44 Mass. App. Ct. 537, 560, 692 N.E.2d 964 (1998).

206.    Defendants' the Frascella Brothers participated in various unfair and deceptive acts and practices alleged through the Complaint.

207.    Defendants' conduct in inducing NRO to enter into the loans involved a series of consumer and commerce related transactions that substantially occurred within the Commonwealth of Massachusetts.

208.    Defendants' loans to NRO were unfair and deceptive under 93A because Defendants knew or should have known that NRO ultimately would not be able to repay the loans when the pyramid scheme finally collapsed.  Accordingly, Defendants violated Mass Gen.

Law ch. 93A by unconscionably making, servicing, or collecting, or attempting to collect, on loans issued to Massachusetts small businesses and individual owners without appropriate evaluation of their ability to repay the loans.

209.    Defendants also engaged in an unconscionable and unfair business practices by intentionally misrepresenting the true nature of the transactions in order to avoid this Commonwealth's criminal laws.

210.    At all relevant times, NRO sought a loan and believed it was getting a loan.

211.    Defendants actively solicited the transactions from NRO by affirmatively representing that they were providing in substance, or, in fact, a loan.

212.    The brokers who negotiated most of the transactions at issue also represented to NRO that it was a receiving a loan from Defendants.

213.    In addition, Defendants falsely represented the market value of the future receivables that Defendants purported to purchase.  This stated value was not based on any true market value assessment but rather was a knowingly false representation unilaterally made by Defendants in order to disguise the true nature of the transactions.

214.    Defendants further knowingly misrepresented the nature of the fees charged in connection with the loans.   Defendants knowingly misrepresented that the fees were reasonable costs of servicing the loans when, in fact, these fees were merely additional interest charged by Defendants in consideration of making the loans.

215.    Defendants also included a choice-of-law provision that represented that Pennsylvania law applied to the transaction.

216.    At the time these representations were made, Defendants knew that the representations were false.

217.    Defendants made these representations with the intent to deceive NRO, and with the intent to avoid the criminal usury laws.

218.    NRO reasonably relied upon these knowingly false representations to its detriment.

219.    Defendants conspired with and acted in concert with other MCA companies to violate Mass. Gen. L. ch. 271, § 49.

220.    Defendants violated Mass. Gen. L. ch. 231, 13A by requiring Plaintiffs to execute a confession of judgment as part of each agreement.

221.    Defendants further violated Mass. Gen. L. ch. 231, 13A when QFC confessed judgment in the amount of $250,898.84 against NRO Edgartown and Alice Indelicato on or about October 21, 2016 with the Supreme Court of the State of New York, County of Westchester.

222.    Defendants again violated Mass. Gen. L. ch. 231, 13A when QFC confessed judgment in the amount of $320,325.92 against NRO Boston and Alice Indelicato on or about October 3, 2016 with the Supreme Court of the State of New York, County of Westchester.

223.    Defendants knew they had no right to obtain judgments by confession against NRO, which judgments totaling $571,224.76 constitute damages under 93A.

224.    In attempting to collect upon the unlawful debt, Defendant also violated N.Y. C.P.L.R. 3218 by obtaining a judgment by confession against Plaintiffs through an affidavit that did not identify the county in which judgment would be entered.

225.    Defendants violation of Mass. Gen. L. ch. 271, § 49 and Mass. Gen. L. ch. 231, 13A constitute per se violations of Mass. Gen. Law ch. 93A §§ 2 and 11.

226.    Defendants also violated Mass Gen. Law ch. 93A §§ 2 and 11 by including unconscionable and unfair provisions in connection with its contracts of adhesion.  Among these unconscionable and unfair provisions, Defendants required NRO to:

   a)  Waive the right to a jury trial;

   b)  Pay Defendants their attorney's fees;

   c)  Waive the right to participate in a class action;

   d)  Waive the right to seek legal redress in their home state;

   e)  Waive the right to contest the forum of any other jurisdiction Defendants
       unilaterally select;

   f)  Execute a Confession of Judgment for the full amount of debt in violation of
       Massachusetts law;

   g)  Execute a Power of Attorney;

   h)  Execute a Security Agreement giving Defendants a UCC lien on all of its assets;

   i)  Execute a personal guarantee making the individual owner of the business
       personally liable for any default under the agreement;

   j)  Indemnify Defendants against third-party claims;

   k)  Waive claims for direct, consequential and punitive damages; and

   l)  Consent to crippling default penalties and enforcement actions.

227.    Defendants' conduct was willful, unfair and unlawful.

228.    Defendants willfully and knowingly violated Mass Gen. Law ch. 93A.

229.    Plaintiffs suffered damages as a direct result of Defendants' unlawful, unfair and deceptive acts.

230.    Defendants are jointly-and-severally liable for all of the damages suffered by Plaintiffs.

WHEREFORE, Plaintiffs seek an order from this Court:

    a)  Ordering Defendants to repay NRO all principal and interest previously paid to Defendants in connection with the criminally usurious loans;

    b)  Granting an injunction against Defendants restraining them from enforcing any of their rights under the criminally usurious loans;

    c)  Awarding Plaintiffs direct and consequential damages in excess of $5 million dollars, including prejudgment interest;

    d)  Awarding Plaintiffs double or treble damages;

    e)  Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

    f)  Granting such other and further relief as this Court deems just and proper.

## COUNT II
(Mass. Gen. L. ch. 271, § 49)

231.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

232.    Each of the agreements entered into between NRO and QFC sets forth a collateralized loan transaction in violation of Mass. Gen. L. ch. 271, § 49.

233.    NRO and QFC intended to enter into a loan transaction for each agreements.

234.    QFC knowingly charged a criminally usurious rate of interest in excess of 20% on the loans and entered into the loans with usurious intent.

235.    The loans are usurious *per se*.

WHEREFORE, Plaintiffs seek an order from this Court:

a) Declaring that each of the agreements entered into between NRO and QFC constitutes a loan transaction, and thus, is void because each charges a criminally usurious interest rate in excess of 20%;

b) Declaring that the choice-of-law provisions in each of the usurious loan transactions is void and unenforceable;

c) Vacating all restraining notices, information subpoenas, liens, garnishments, levies, and other enforcement mechanisms in connection with the loans;

d) Ordering QFC to repay NRO all principal and interest previously paid by NRO to QFC and other MCA companies in connection with the criminally usurious loans, including prejudgment interest; and

e) Granting such other and further relief as this Court deems just and proper.

## COUNT III
### (Mass. Gen. L. ch. 231, 13A)

236.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

237.    Each of the agreements entered into between NRO and QFC sets forth a collateralized loan transaction to which Massachusetts usury laws are applicable, and should be declared void under Mass. Gen. L. ch. 271, § 49.

238.    Each of the agreements entered into between NRO and QFC is illegal to possess under Mass. Gen. L. ch. 271, § 49(b).

239.    The Confessions of Judgment that Plaintiffs were forced to execute in connection with the loans were all executed within Massachusetts, by a Massachusetts business and resident, through a Massachusetts notary public.

-33-

240. Each of these Confessions of Judgment is thus null and void under Mass. Gen. L. ch. 231, 13A.

241. Plaintiffs do not regularly transact business in the State of New York.

242. Accordingly Plaintiffs are not subject to the personal jurisdiction of the State of New York.

243. The Judgments by Confession obtained by QFC against NRO Boston and NRO Edgartown in the State of New York is therefore unenforceable.

WHEREFORE, Plaintiffs seeks an order from this Court:

    a) Declaring that every Affidavit Confessing Judgment is void ab initio;

    b) Declaring that any Judgment by Confession obtained by QFC is unenforceable;

    c) Declaring that Plaintiffs are not subject to the personal jurisdiction of New York with respect to any of the loans at issue; and

    d) Granting such other and further relief as this Court deems just and proper.

## COUNT IV
### (Negligence and Negligent Misrepresentation)

244. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

245. QFC held itself out as providing financial consulting services for the purpose of assisting NRO with managing its existing debt and increasing its business cash flow.

246. QFC represents on its website that:

"At Quick Fix Capital we know that every business is unique. No one understands your company's funding needs as well you do. *Quick Fix Capital analyzes merchant requests individually and on their own merits to offer financing that best satisfies their requirements and goals.* We are able to present business owners with more and better options than our competition." (emphasis added).

247.    In connection with these financial consulting services, QFC supplied NRO with information for their own personal gain.

248.    In providing this information, QFC represented that it was providing specialized information to NRO based on their expertise and knowledge of small business needs.

249.    In providing this information, QFC represented that each of the transactions at issue were designed to help NRO's business grow and prosper.

250.    In providing this information, QFC represented that NRO's business would be able to afford and comply with the terms and conditions of each transaction.

251.    In providing this information, QFC failed to reasonably investigate NRO's financial condition in order to reasonably assess the financial needs and capabilities of NRO.

252.    In providing this information to NRO, QFC placed its own financial gain ahead of NRO's.

253.    In providing this information to NRO, QFC intended and/or knew that the information provided would be used in the course of NRO's own business activity.

254.    In providing this information to NRO, it was reasonably foreseeable that NRO would rely upon the information provided by QFC to NRO.

255.    The information provided by QFC was false.

256.    Any reasonably prudent financial consultant would have known that the information provided by QFC was false.

257.    Any reasonably prudent financial consultant would never have advised NRO to enter into any of the transactions at issue.

258.    Any reasonably prudent financial consultant would have known that each of the transactions at issue would cause substantial financial harm to NRO's business.

259.   Any reasonably prudent financial consultant would have known that each of the transactions at issue would *not* help its business grow as promised and represented.

260.   NRO reasonably relied upon these knowingly false, misleading and/or negligent representations to its detriment.

261.   But for these false representations by QFC, NRO would not have entered into any of the transactions at issue.

262.   QFC owed a duty of care to NRO.

263.   QFC breached its duty of care to NRO by providing false, misleading and/or negligent information to NRO.

264.   NRO suffered damages as a direct result of QFC' negligent representations and/or negligent conduct.

265.   QFC is jointly-and-severally liable for all of the damages suffered by NRO.

WHEREFORE, Counterclaim Plaintiffs seek an order from this Court:

a) Ordering QFC to repay NRO all principal and interest previously paid to QFC in connection with the criminally usurious loans;

b) Granting an injunction against QFC restraining it from enforcing any of its rights under the criminally usurious loans;

c) Awarding Plaintiffs direct and consequential damages in excess of $5 million dollars, including prejudgment interest; and

d) Granting such other and further relief as this Court deems just and proper.

## COUNT V
**(In the alternative, Contract)**

266.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

267.    Each of the agreements entered into between NRO and QFC sets forth a collateralized loan transaction to which Massachusetts usury laws are applicable.

268.    Section 3.1 of QFC's Agreement provides that: "In the event that a court determines that QFC charged or received interest hereunder and interest is in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and QFC shall promptly refund to Merchant any interest received by QFC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that QFC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law."

269.    NRO has paid and QFC has received interest in excess of the maximum civil usury interest rate of 20% that is allowed under Massachusetts law.

WHEREFORE, Plaintiffs seeks an order from this Court:

a)  Declaring each of the agreements entered into between NRO and QFC as a loan transaction;

b)  Ordering  QFC to repay NRO all interest previously paid to QFC and other MCA companies in excess of 20%, including prejudgment interest; and

c)  Granting such other and further relief as this Court deems just and proper.

WHITE AND WILLIAMS LLP


BY:    /s/Justin E. Proper
       Justin E. Proper
       Shane R. Heskin
       1650 Market Street
       One Liberty Place, Suite 1800
       Philadelphia, PA  19103-7395
       Phone: 215.864.7165
       Attorneys for Plaintiffs


Dated: November 6, 2017