## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NRO BOSTON, LLC; NORTH RIVER
OUTFITTERS; NRO SPORT, LLC; NRO
EDGARTOWN LLC; JASON INDELICATO and
ALICE INDELICATO

     Plaintiffs,

  v.

Funding Metrics, LLC d/b/a QUICK FIX CAPITAL,
DAVID W. FRASCELLA, JR. and LARRY D.
FRASCELLA, JOHN AND JANE DOE
DEFENDANTS,

     Defendants.

Civil Action No. 2:17-cv-05008-JCJ

**JURY TRIAL DEMANDED**

**SECOND AMENDED
COMPLAINT**

## SECOND AMENDED COMPLAINT AND DEMAND FOR A TRIAL BY JURY

  Plaintiffs NRO Boston, LLC, North River Outfitters, NRO Sport, LLC, NRO Edgartown, LLC (collectively "NRO") and Alice Indelicato and Jason Indelicato (collectively " Plaintiffs"), by their attorneys, White and Williams LLP, as and for their and demand for a trial by jury, allege:

## NATURE OF THE ACTION

  1. This is an action to save a small Massachusetts business from financial ruin at the hands of Defendant Funding Metrics, LLC d/b/a Quick Fix Capital ("QFC") and its owners, David and Larry Frascella's (the "Frascella Brothers") predatory lending practices.

  2. Defendants, at the direction of the Frascella Brothers, engaged in an unlawful scheme whereby they have induced Plaintiffs to enter into and/or personally guarantee criminally

usurious loans that they knew Plaintiffs could not pay off without entering into subsequent loans, resulting in certain financial catastrophe.

3. QFC is one of many Merchant Cash Advance ("MCA") companies that prey upon small businesses that are desperate and in need of quick cash. These MCA companies advance funds to small businesses pursuant to so-called future account receivable purchase agreements or merchant cash advance agreements. The terms and conditions of these agreements are wholly inaccurate, misleading and knowingly designed to disguise the true nature of the transaction in order to escape the criminal usury laws of various states. When the small businesses cannot meet their obligations under these agreements, the MCA companies offer new advances under even more unconscionable terms. Eventually, compliance with the terms becomes too oppressive, the small businesses default, and the MCA companies aggressively pursue the small businesses and their owners for repayment of the amounts due under the agreements, often employing threatening and illegal collection tactics. In the end, the small businesses face certain financial ruin while the MCA companies recover not only the principle advanced, but also substantial fees and interest at rates that far exceed any interest rate permitted by applicable law.

4. As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses.[1] It's a high-risk market, and interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's." *Id.*

5. In June of 2017, Congressman Emanuel Cleaver, II, launched an investigation of small business financial technology ("FinTech").

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

6.    Congressman Clever was "particularly interested in payday loans for small businesses, also known as 'merchant cash advance."[2]

7.    He expressed concern that "some FinTech lenders may be trapping small business owners in cycles of debt…"

8.    The National Consumer Law Center came to the same conclusion:

Merchant cash advances operate very similarly to payday loans and have similar problems. A lump sum of cash is taken out as an advance on a borrower's future sales. The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account.[3]

9.    As reported by CNN, "[m]any business owners take out new advances in order to pay off outstanding balances on previous advances, plunging them into a cycle of debt."[4]

10.    According to the Consumer Financial Protection Bureau, over 19 million U.S. households resort to payday loans. Of that number, almost 70% of borrowers have to take out a second loan to cover the first, and 20% end up saddled with 10 or more loans, one after the other.

11.    The New York State Department of Financial Services has recognized "the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt and predatory collection practices," and has vowed "to protect New Yorkers from unscrupulous practices and [] oppose any attempt to evade New York's laws."[5]

---

[2] Scott M. Pearson, *House Member Launches FinTech Lending Investigation*, CONSUMER FINANCE MONITOR (June 26, 2017), https://www.consumerfinancemonitor.com/2017/06/26/house-member-launches-fintech-lending-investigation/.

[3] National Consumer Law Center, Comments to the Comptroller of the Currency Office of the Comptroller of the Currency on *Exploring Special Purpose National Bank Charters for Fintech Companies*, National Consumer Law Center (Jan. 17, 2017)http://www.nclc.org/images/pdf/banking_and_payment_systems/ fintech/comments-fintech-jan2017.pdf..

[4] Octavio Blanco, *Controversial Cash Advances Come At A High Cost To Small Businesses*, CNNMONEY (Dec. 1, 2016, 2:28 PM), http://money.cnn.com/2016/12/01/news/economy/merchant-cash-advance/index.

[5] Letters from Maria T. Vullo, Superintendent, New York State Department of Financial Services, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017 and April 14, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-nys-dept-financial-services.pdf.

12.     The New York Attorney General's Office has also acknowledged the damage these loans do, stating: "[a]lthough many of these companies profess to offer cash-strapped consumers much needed access to loans, they typically charge exorbitant interest rates that essentially force struggling consumers to roll over one payday loan into another and that trap consumers in a vicious, never ending cycle of high-cost borrowing that they can never repay."[6]

13.     Attorney Generals of other states have echoed the same public policy concern in bringing enforcement actions against payday lenders: "These companies targeted thousands of financially-stressed consumers in need of a loan, and charged exorbitant interest rates and fees, causing these consumers and their families to incur even greater economic strain....We are pleased to have worked with the Division of Banks in order to obtain significant restitution for consumers who were harmed, and permanently stop these lenders from doing business in Massachusetts."[7]

14.     Like others within the MCA industry, QFC is the commercial equivalent of a payday lender. It preys on the weak and desperate and extorts unconscionable terms that are expressly prohibited by the criminal laws, civil statutes, and the strong public policy of Massachusetts.

15.     Plaintiffs are a victim of this scheme.

16.     QFC was more than happy to pile on along with the other MCA companies who were preying on NRO.

---

[6] Letter from Jane M. Azia, Bureau Chief, Consumer Frauds and Protection, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-ny-atty-general.pdf.

[7] Attorney General of Massachusetts, *Unlicensed Lenders to Refund Millions to Consumers Over Illegal Online Lending Scheme*, OFFICIAL WEBSITE OF THE ATTORNEY GENERAL OF MASSACHUSETTS (Oct. 29, 2015), http://www.mass.gov/ago/news-and-updates/press-releases/2015/2015-10-29-unlicensed-lenders.html.

17.    QFC entered into thirteen different loan transactions with NRO with interest rates ranging from 364% to 1,056%.

18.    Loan proceeds from one loan were regularly used to pay off prior loans until the house of cards ultimately collapsed.

19.    QFC knew that NRO's business would inevitably fail if NRO continued to make the required daily payments as many of the loan agreements purported to purchase *over 100% of NRO's gross receivables*.

20.    Because of the illegal and unconscionable terms of these loans, there was not enough money coming in the door to make the daily payments to QFC, much less pay operating expenses which QFC knew also included payments to other MCA companies.

21.    QFC knew that its loans and the loans from other MCA companies were unsustainable.

22.    In fact, at the end the pyramid scheme with which Defendants knowingly participated, NRO was required to make daily payments of approximately $50,000 to QFC and other MCA companies.

23.    Defendants were not concerned about NRO defaulting under the agreements because the agreements give it every possible protection, including security agreements, personal guarantees and confessions of judgments (which happen to be illegal in Massachusetts).

24.    This action seeks monetary damages for Defendants' knowing and intentional violation of Massachusetts' usury and consumer protection laws.

## THE PARTIES

25.    Plaintiff NRO Boston, LLC is a Massachusetts corporation with its principal place of business located at 124-26 Charles Street, Boston, Massachusetts 02114. Each of its LLC members is a citizen of Massachusetts.

26.    Plaintiff North River Outfitters is a Massachusetts corporation with its principal place of business located at 124-26 Charles Street, Boston, Massachusetts 02114. Each of its LLC members is a citizen of Massachusetts.

27.    Plaintiff NRO Sport, LLC is a Massachusetts corporation with its principal place of business located at 124-26 Charles Street, Boston, Massachusetts 02114. Each of its LLC members is a citizen of Massachusetts.

28.    Plaintiff NRO Edgartown, LLC is a Massachusetts corporation with its principal place of business located at 4 Dock Street, Edgartown, Massachusetts 02539. Each of its LLC members is a citizen of Massachusetts.

29.    Plaintiffs Alice and Jason Indelicato are individuals who are citizens of Massachusetts and reside at 3 Oakdale Boston, MA 02539.

30.    Defendant QFC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with a registered fictitious name of Quick Fix Capital, with its principal place of business located at 884 Town Center Drive, Langhorne, PA 19047.

31.    Upon information and belief, each of Defendant QFC's LLC members is a citizen of Pennsylvania.

32.    David W. Frascella is the Chairman and co-founder of QFC.

33.    David Frascella, upon information and belief, is a citizen of Pennsylvania residing at 5 Stonebridge Crossing Rd, Newtown, PA 18940.

34.     Larry D. Frascella is the owner and co-founder of QFC.

35.     Larry Frascella, upon information and belief, is a citizen of Pennsylvania residing at 130 Forrest Creek Ct, Feasterville Trevose, PA 19053.

36.     On information and belief, each of the John and Jane Doe Defendants are investors in QFC and each is a citizen of New York, New Jersey or Pennsylvania.

## JURISDICTION AND VENUE

37.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on NRO's claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.   The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution

38.     This Court has original jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

39.     The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §§ 1332 & 1367(a).

40.     Defendants are subject to the personal jurisdiction of this Court because they are physically present in Pennsylvania, and regularly transact business in Pennsylvania.

41.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Pennsylvania.

## FACTS COMMON TO ALL COUNTS

42.     NRO is a clothing and sports retailer with locations in Beacon Hill, Martha's Vineyard, Nantucket and Wellesley.

43.     It is owned by Alice and Jason Indelicato, who are husband and wife, and have lived in Massachusetts the majority of their life.

44.     NRO and its individual owners have been victimized by a group of predatory lenders that have routinely and systematically taken advantage of them for years, slowly devastating an otherwise profitable business that has employed dozens of Massachusetts residents for nearly a decade.

45.     NRO and its owners are not alone.

46.     Numerous other Massachusetts small businesses and citizens have similarly been victimized by the same predatory scheme.

47.     QFC and its owners, the Frascella Brothers, are the commercial equivalent of payday lenders.

48.     Defendants prey on the weak and desperate and extort unconscionable terms that are expressly prohibited by the criminal laws, civil statutes, and the strong public policy of this Commonwealth.

49.     The Frascella Brothers have a long career of using a variety of shams and ruses, including a "rent-a-bank scheme" with a prior payday lending business, to cloak illegal lending activities that violate state usury laws.

50.     With increased regulatory scrutiny and consumer lawsuits filed against payday lenders, the Frascella Brothers closed their illegal Pennsylvania payday lending business and turned their sights to a new criminal venture – usurious loans to small businesses.

51. The loans are illegal because the Defendants are charging interest rates to small businesses that are 25 to 50 times greater than the maximum amount permitted by states like Massachusetts and New York.

52. Defendants are not a bank or thrift chartered under the laws of the United States.

53. Defendants are not a bank chartered under the laws of any state and insured by the Federal Deposit Insurance Corporation.

54. Defendants are completely unregulated.

55. Defendants make the following representation on their website:

> As a leading business cash advance provider, we can offer funding when our competitors would decline, why? Because our superior underwriting allows us to identify solid businesses that other providers fail to recognize. Quick Fix Capital understands the role innovation and technology play in alternative finance. While most of our competitors require business owners to spend hours assembling and sending reams of documents, Quick Fix Capital requires much less paperwork. Instead we score each application primarily using the many available online data sources.

https://www.quickfixcapital.com/about_us.

56. Defendants further represent that:

> At Quick Fix Capital we know that every business is unique. No one understands your company's funding needs as well you do. Quick Fix Capital analyzes merchant requests individually and on their own merits to offer financing that best satisfies their requirements and goals. We are able to present business owners with more and better options than our competition.

https://www.quickfixcapital.com.

57. These representations are knowingly false.

58. Defendants do not care whether the businesses can afford to make the payments or not.

59. Defendants did not offer financing based on NRO's requirements or goals.

60.   Providing loans with interesting rates ranging from 364% to 1,056% did not help NRO.

61.   Defendants did not do any underwriting to ensure that NRO could repay the loans.

62.   Defendants only cared about making as much money as possible on NRO by charging obscene interest rates to businesses in need of working capital that cannot obtain traditional financing.

63.   Defendants know or should know that their illegal business model will lead to businesses failing, which they safeguard against through security agreements, personal guarantees and confessions of judgment.

64.   Defendants know all too well that the transactions are illegal in those states that have usury laws with respect to commercial loans.

65.   Defendants attempt to legitimize the transaction through subterfuge.

66.   Defendants label the transactions as the purchase and sale of receivables by using a common instrument that purports to be a "factoring agreement."

67.   The NRO agreements (which are unconscionable contracts of adhesion), however, lack all of the hallmarks of a true "factoring agreement."

68.   Rather, the NRO agreements are, in truth, nothing more than a series of collateralized loans provided at unconscionably high interest rates.

69.   As long held by the Massachusetts Supreme Judicial Court, Defendants' attempts to disguise the true nature of these transactions will not be tolerated:

> Usury does not consist in the intent with which parties take or pay unlawful interest. It is the transaction to which the law looks, in order to ascertain whether it is usurious or otherwise. The prohibition of the statute embraces every contract or assurance for the payment of money with interest at a greater rate than is allowed by law, irrespective of the motive or intent of the parties in making it.

Whatever form or disguise the dealing of the parties may assume, it will be deemed usurious if in effect it is a loan of money at an unlawful rate of interest.

70.     *Sylvester v. Swan,* 87 Mass. (5 Allen) 134 (1862); *Hopkins v. Flower,* 256 Mass. 367, 372 (1926) ("[N]o device intended to cover up the real character of the transaction can ever avail to defeat the [usury] statute.").

### The So-Called "Factoring Agreements" are Disguised Loans

71.     While QFC's agreements purport to purchase future receivables based on a specified percentage of NRO's daily receivables and even contain self-serving language that the agreement is not a loan, this language cannot save QFC from Massachusetts' usury laws.

72.     It is the true nature of the transaction, not what QFC self-servingly calls the transaction that Massachusetts courts use to determine whether the agreement is a loan or a sale.

73.     QFC's agreements lack all of the hallmarks of a true "factoring agreements," and thus, are collateralized loans at illegally high and unconscionable interest rates. The QFC agreements actually provide that NRO is selling, assigning and transferring ***all of its future accounts***, contract rights and other obligations to QFC in consideration for the "Purchase Price."

74.     But the agreements provide that NRO must repay the "Purchased Amount" by making fixed daily payments which are purportedly based on a "Purchase Percentage."

75.     If the transactions were really sales (which they are not), QFC would have known that it could not purchase all of NRO's receivables because it knew that NRO had agreements with other MCA companies where it already sold a percentage of its receivables.

76.     Further, unlike a true sale of receivables, the risk of loss associated with the purchased receivables was not transferred to QFC.

77.     A default is declared, under Section 3.12, if "(a) Seller interferes with the Buyer's right to collect the current payment due (and any payment for arrears, if any) in violation of this

-11-

Agreement; (b) Seller violates any term or covenant in this Agreement; (c) Any representation or warranty by Seller in this Agreement is incorrect, false or misleading in any material respect when made; (d) Seller admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or any proceeding is instituted by or against Seller to adjudicate it bankrupt or seeking reorganization, arrangement, adjustment or composition of its debts; ... (f) seller transports, moves, interrupts, suspends, dissolves or terminates its business..."

78.     It is an express term of the QFC agreements to make the daily payment and to repay the full "Purchased Amount."

79.     The QFC agreements also state that "[a]fter **three (3)** consecutive NSF's the Merchant will be in default and the default fee shall be accessed (sic)." Addendum to the NRO Edgartown Agreement, dated, 10/27/2015 (emphasis in the original).

80.     The default fee is twenty **(20%) percent** of the original advanced amount or **$5,000,** whichever is greater. *See id.* (emphasis in the original).

81.     Not even bankruptcy or the business having to close for fire or natural disaster would transfer the risk of loss to QFC.

82.     NRO had an unconditional obligation under the QFC agreements to make the fixed daily payment and to repay "Purchased Amount" whether it generated receivables or not.

83.     The QFC agreements are not a "true sale" when Defendants included contractual language where they have full recourse against the Plaintiffs if there are no receivables available to make the daily payment.

84.     In the event of any one of these defaults, Defendants are then permitted to immediately seize the business assets secured under the Security Agreement as well as the personal assets of NRO's private business owners under the Personal Guarantee.

85.     Even more outrageous, under a vast majority of the agreements, Defendants are permitted to obtain a Judgment by Confession without even notifying Plaintiffs—which is illegal in Massachusetts.

### The QFC Agreements With NRO Boston

86.     From May 2015 to July 2016, Plaintiff NRO Boston entered into a series of nine (9) loans with Defendant QFC. NRO was required to turn over all of its passwords and bank information at the inception of these agreements.

87.     Beginning on May 18, 2015, NRO Boston entered into an agreement (the "May 2015 Agreement") with QFC in which it purportedly sold $107,250 of future receivables for $75,000.

88.     The "Purchase Percentage"[8] of daily receivables for the May 2015 Agreement was 10.84%, but the fixed daily payment[9] required Plaintiffs to make 99 daily payments of $1,083.33.

89.     The effective annual interest rate for the May 2015 Agreement was at least 592%.

90.     The subsequent agreements that NRO entered into with Defendant QFC were substantially similar to that May 2015 Agreement.

91.     On June 22, 2015, NRO Boston entered into an agreement (the "June 2015 Agreement") with QFC in which it purportedly sold $91,650 in future receivables for $65,000.

92.     The June 2015 Agreement provided that the "Purchase Percentage" was 25.72%, but the fixed daily payment required NRO Boston to make 99 daily payments of $925.76.

---

[8] The "Purchase Percentage" was supposedly a percentage of a merchant's daily receivables that was to be turned over to QFC pursuant to the terms of the purported "factoring agreement."

[9] The daily payment was a fixed payment determined by Defendant QFC that NRO Boston were required to pay for a finite number of days and bore no relationship to NRO Boston's daily receivables.

93. The effective annual interest rate for the June 2015 Agreement was at least 540%.

94. On July 15, 2015, NRO Boston entered into an agreement (the "July Agreement") with QFC in which it purportedly sold $214,500 in future receivables for $150,000 (including $62,833.47 for an existing balance payoff).

95. The July 2015 Agreement provided that the "Purchase Percentage" was 62.86%, but the fixed daily payment required NRO Boston to make 99 daily payments of $2,166.67.

96. The effective annual interest rate for the July 2015 Agreement was at least 592%.

97. On August 20, 2015, NRO Boston entered into an agreement (the "August 2015 Agreement") with QFC in which it purportedly sold $214,500 in future receivables for $150,000 (including $52,768.08 for an existing balance payoff).

98. The August 2015 Agreement provided that the "Purchase Percentage" was 44.25%, but the fixed daily payment required NRO Boston to make 110 daily payments of $1,950.00.

99. The effective annual interest rate for the August 2015 Agreement was at least 456%.

100. On September 28, 2015, NRO Boston entered into an agreement (the "September 2015 Agreement") with QFC in which it purportedly sold $307,450 in future receivables for $215,000 (including $103,999.89 for an existing balance payoff).

101. The September 2015 Agreement provided that the "Purchase Percentage" was 12%, but the fixed daily payment required NRO Boston to make 99 daily payments of $3,105.56.

102. The effective annual interest rate for the September 2015 Agreement was at least 592%.

103. On December 10, 2015, NRO Boston entered into an agreement with QFC in which it purportedly sold $138,000 in future receivables for $100,000. This agreement had a New York choice of law provision.

104. The December 10, 2015 Agreement provided that the "Purchase Percentage" was 28.47%, but the fixed daily payment required NRO Boston to make 110 daily payments of $1,254.55.

105. The effective annual interest rate for the December 10, 2015 Agreement was at least 364%.

106. On January 15, 2016, NRO Boston entered into an agreement (the "January 2016 Agreement") with QFC in which it purportedly sold $531,749 in future receivables for $371,852 (including $171,852.57 for an existing balance payoff).

107. The January 2016 Agreement provided that the "Purchase Percentage" was **99.73%**, but the fixed daily payment required NRO Boston to make 121 daily payments of $4,394.62.

108. The effective annual interest rate for the January 2016 Agreement was at least 367%.

109. On April 19, 2016, NRO Boston entered into an agreement (the "April 2016 Agreement") with QFC in which it purportedly sold $214,500.00 in future receivables for $150,000.00. This agreement had a New York choice of law provision.

110. The April 2016 Agreement provided that the "Purchase Percentage" was 10.16%, but the fixed daily payment required NRO Boston to make 110 daily payments of $1,950.00.

111. The effective annual interest rate for the April 2016 Agreement was at least 456%.

112.    On July 7, 2016, NRO Boston entered into an agreement (the "July 2016 Agreement") with QFC in which it purportedly sold $286,000 in future receivables for $200,000 (including $107,250.00 for an existing balance payoff). This agreement had a New York choice of law provision.

113.    The July 2016 Agreement provided that the "Purchase Percentage" was 11.64%, but the fixed daily payment required NRO Boston to make 121 daily payments of $2,363.64.

114.    The effective annual interest rate for the July 2016 Agreement was at least 367%.

115.    NRO Boston made all required payments starting on or around May 2015 until August 2016 when one of its MCA companies, Saturn Funding, used its full-recourse protections to freeze NRO's business accounts.

### The QFC Agreements With NRO Edgartown

116.    NRO Edgartown is a seasonal business that only operates from May to October.

117.    QFC nevertheless entered into agreements with NRC Edgartown during months in which it was not even open for business.

118.    NRO Edgartown was used as a front to disguise the real borrower—NRO Boston.

119.    In each of the below transactions, NRO Edgartown was the name on the loan, but the proceeds were taken out of NRO Boston's accounts.

120.    QFC's transactions with NRO Edgartown were done to obtain greater security when NRO ultimately defaulted because it knew other MCA companies were simultaneously preying on NRO.

121.    From October 2015 to June 2016, Plaintiff NRO Edgartown entered into a series of four (4) loans with QFC. NRO Edgartown was required to turn over all of its passwords and bank information at the inception of these agreements.

-16-

122.     On October 27, 2015, NRO Edgartown entered into an agreement (the "October 2015 Agreement") with QFC in which it purportedly sold $83,400 in future receivables for $60,000.

123.     The October 2015 Agreement provided that the "Purchase Percentage" was 34.75%, but the fixed daily payment required NRO Edgartown to make 66 daily payments of $1,263.63.

124.     The subsequent agreements that NRO Edgartown entered into with QFC were substantially similar to that October 2015 Agreement.

125.     The effective annual interest rate for the October 2015 Agreement was at least 1,056%.

126.     On December 24, 2015, NRO Edgartown entered into an agreement with QFC in which it purportedly sold $117,450 in future receivables for $81,000 (including $32,854.80 for an existing balance payoff).

127.     The "Purchase Percentage" for the December 24, 2015 Agreement was 44.94%, but the fixed daily payment required Plaintiff NRO Edgartown make 99 daily payments of $1,186.36.

128.     The effective annual interest rate for the December 24, 2015 Agreement was at least 648%.

129.     On February 23, 2016, NRO Edgartown entered into an agreement (the "February 2016 Agreement") with QFC in which it purportedly sold $261,690 in future receivables for $183,000 (including $66,436.52 for an existing balance payoff).

130. The February 2016 Agreement provided that the "Purchase Percentage" was *156.25%*, but the fixed daily payment required NRO Edgartown to make 110 daily payments of $2,379.00.

131. QFC actually contracted to debit every business day from NRO Edgartown's account more receivables than NRO Edgartown generated, which again shows that this transaction was a sham sale.

132. The February 2016 Agreement illustrates that QFC was actively participating and/or was complicit in the pyramid scheme being perpetrated by many of the major players in the MCA industry against NRO.

133. The effective annual interest rate for the February 2016 Agreement was at least 456%.

134. On June 7, 2016, NRO Edgartown entered into an agreement (the "June 2016 Agreement") with QFC in which it purportedly sold $286,000.00 in future receivables for $200,000.00 (including $88,023 for an existing balance payoff). This agreement had a New York choice of law provision.

135. The June 2016 Agreement provided that the "Purchase Percentage" was *114.40%*, but the fixed daily payment required NRO Edgartown to make 110 daily payments of $2,600.00.

136. The effective annual interest rate for the June 2016 Agreement was at least 456%.

137. NRO Edgartown made all required payments starting on or around May 2015 until August 2016 when one of its MCA companies, Saturn Funding, used its full recourse protections by freezing NRO's business accounts.

**QFC Knew That Its Loans Transactions With NRO Doomed NRO To Fail**

138. Even without the involvement of other MCA companies, QFC knew that there was no way that NRO could repay the loans with its own revenue.

139. QFC took *99.73%* of every dollar NRO Boston generated in January 2016, *156.25%* of every dollar NRO Edgartown generated in February 2016, and *114%* of every dollar NRO Edgartown generated in June 2016.

140. There was no money left for NRO to pay its expenses.

141. QFC therefore knew that NRO Boston could not repay the loans without defaulting or entering into new loans to pay off these loans and the other MCA loans.

142. Even worse, Defendants knew or should have known from NRO's bank statements, which were submitted in connection with each loan transaction and/or which QFC was given access to as a requirement of each loan, that NRO was required to make payments to other MCA companies at the time they was lending money to NRO.

143. For example, Yellowstone issued a series of purported "factoring agreements" over the course of just five months. Each daily payment amount was allegedly based on 15% of NRO's daily future receivables. The specified daily payment for each of these transactions, however, varied from $973 to $6,995 in proportion to the amount of the loan, not the so called "good-faith" estimate of what would be 15% the merchant's daily receivables:

| | | | | | Daily $ | Daily% |
|---|---|---|---|---|---|---|
| NRO Boston | Yellowstone Capital | 2/23/2016 | 100,000 | 145,900 | 1,621 | 15% |
| NRO Edgartown | Yellowstone Capital | 3/11/2016 | 60,000 | 87,540 | 973 | 15% |
| NRO Boston | Yellowstone Capital | 3/28/2016 | 210,000 | 306,390 | 3,064 | 15% |
| NRO Edgartown | Yellowstone Capital | 5/17/2016 | 100,000 | 145,900 | 3,316 | 15% |
| NRO Boston | Yellowstone Capital | 5/17/2016 | 250,000 | 364,750 | 1,327 | 15% |
| NRO Edgartown | Yellowstone Capital | 6/16/2016 | 335,000 | 499,990 | 5,995 | 15% |
| NRO Boston | Yellowstone Capital | 6/29/2016 | 270,000 | 409,738 | 3,499 | 15% |
| NRO Boston | Yellowstone Capital | 7/26/2016 | 400,000 | 699,950 | 6,995 | 15% |
| NRO Edgartown | Yellowstone Capital | 7/27/2016 | 400,000 | 699,950 | 6,995 | 15% |

144. As a matter of law, QFC cannot purchase receivables that already had been sold, proving that all of the transactions by it and the other MCA companies with NRO were loans.

145. There could not be any clearer evidence that QFC's purported purchase of more receivables than NRO was expected, or could have reasonably been expected to generate, was a sham. Indeed, it is impossible to purchase greater than 100% of a business' receivables.

146. QFC also knew full well that by taking part, either directly or indirectly, in the pyramid scheme with the other MCA companies that NRO was doomed to fail or default.

147. After QFC took its daily payment, it was literally impossible for NRO to continue to pay its expenses.

148. This left NRO with no viable options. It could either continue to take out additional loans to payoff existing loans or it could cease operations, which is an event of default subjecting the owners to personal liability.

149. Either way, QFC had full recourse to recover its monies, which it did by filing confessions of judgment in New York against NRO and NRO Edgartown.

150. Incredibly, QFC publicly touts its services as "Intelligent Business Decisioning."

151. There was nothing intelligent about NRO having to incur a vicious cycle of spiraling debt so that it could continue to make usurious payments to QFC and the other MCA companies with whom QFC was complicit.

### Defendants Violated Massachusetts Law and Their Attempt to Contract Around its Usury Laws Is Not Permitted In This Circuit

152. All but three of the Agreements contain Pennsylvania choice-of-law and Pennsylvania venue provisions.

153. The other three Agreements contain a New York choice-of-law provision. The State of New York had no connection to the underlying transaction whatsoever. Rather,

Defendants shifted to a New York choice-of-law provision to take advantage of New York's confession of judgment statute, and its related post-judgment collection mechanisms.

154. The law in this Circuit is clear that the contractual choice-of law provision designating Pennsylvania will not be applied where the application would violate the fundamental policy of another State, which in this case it does.

155. QFC's agreements with Plaintiffs violated Mass. Gen. L. ch. 271, § 49.

156. The title of the statute is Criminal Usury, which is a felony punishable up to ten years in state prison. Moreover, this criminal statute is contained within Chapter 271 of Massachusetts General Laws, titled "Crimes Against Public Policy."

157. Nor can Defendants use a choice-of-law provision to contract around the laws of Plaintiffs' residence, which laws Defendants knew they were violating by charging interest rates ranging between 364% and 1056%. *See Cashcall, Inc. v. Mass. Div. of Banks,* 3 Mass. L. Rep. 5 (Mass. Super. Ct. 2015) (holding that Massachusetts criminal usury laws applied to out-of-state resident despite choice-of-law provision because "[a]ll of the loans were applied for, paid from, and collected from Massachusetts.").

158. Among other unconscionable business practices, each of the Defendants has knowingly and intentionally violated Mass. Gen. Law ch. 271, § 49 by charging outrageous interest rates on loans that are several times the 20% maximum interest rate permitted under the criminal laws of this Commonwealth.

159. A violation of this Commonwealth's criminal usury law is not a minor infraction; it is a felony punishable up to ten years in state prison.

160. It is also a felony to even possess the instrument.

161. As the Attorney General of Massachusetts has advised, usury is:

offensive, detrimental and injurious to the life, health and general welfare of the borrowers and their families," in that it diverts a large percent of the borrowers' incomes from "otherwise beneficial directions," and materially reduces their ability to obtain the social and economic benefits which their incomes would normally secure to them. Said activities breed strife and unrest *and cause the borrower in his extremity to go to others engaged in the same unlawful activities*, further depriving himself and his family of the necessities of life and resulting in emotional and mental distress affecting the borrower's performance as an employee and *adding to the relief rolls*. Said business is obnoxious and detrimental to retailers of goods who serve the borrowers and their families because the excessive interest reduces the sum available to pay for supplies furnished. *Because of these effects on many hundreds of persons the Defendants' activities are contrary to the good morals, public peace and general welfare of the people and contrary to the public policy of the Commonwealth.* The majority of the borrowers are humble citizens, ignorant of the law, and their legal rights against the Defendants are inadequate and ineffective. They have no means to defend themselves. There is thus presented, the bill alleges, "an intolerable situation" that cannot be remedied, except by relief in equity.

*Commonwealth v. Stratton Finance Co.*, 38 N.E.2d 640, 641-42 (Mass. 1941) (emphasis added).

162.    Every one of these concerns has materialized in this case.

163.    The criminally usurious nature of these transactions constitutes a per se violation of Massachusetts' consumer protection statute (Mass. Gen. Law ch. 93A) and the use of purported "factoring agreements" demonstrates the willful intent necessary to treble the damages.

164.    As a further demonstration of their unfair and deceptive practices, QFC included other unconscionable and unfair provisions in their contracts of adhesion to further intimidate their victims from seeking the statutory and constitutional protections of Massachusetts.

165.    Among other things, QFC included provisions requiring their victims to waive: (1) the legal protections and jurisdiction of Massachusetts; (2) their constitutional right to a jury trial; and (3) their right to participate in a class action.

166.    There are also myriad other punitive default provisions that have been declared unlawful by the Massachusetts Supreme Judicial Court.

167. Each of these provisions is unenforceable because, among other reasons, they offend the strong public policy of Massachusetts.

168. By requiring Plaintiffs to execute a confession of judgment within Massachusetts's borders, through a Massachusetts notary public, QFC also violated Mass. Gen. L. ch. 231, 13A, which provides that "any stipulation . . . in a promissory note . . . whereby a party thereto agrees to confess judgment . . . or agrees to authorize another person to confess judgment . . . shall be void." This is likewise a per se violation of Mass Gen. Law ch. 93A.

169. The extortionate terms of these loans are also a *per se* violation of 93A because they require NRO and its individual owners to waive service of process in violation of Mass. Gen. L ch. 231, § 13A:

> Any judgment entered in an action upon a contract, promissory note or other instrument in which or in a memorandum or writing relating to which is contained a stipulation, whereby the defendant in such action waived or agreed to waive or authorized another person to waive or agree to waive the issue or service of process in such an action shall be set aside or vacated on motion of the defendant, unless it appears that service in the usual manner was had upon him or that the plaintiff sent to him by registered mail at least seven days before the entry of such action a notice of his intention to enter the same on said day and at the time of entry filed an affidavit of giving notice as aforesaid, which affidavit shall be prima facie evidence of the giving thereof.

170. Every one of these confessions of judgment was executed in Massachusetts, by Massachusetts residents and businesses, through a Massachusetts notary.

171. In fact, QFC actually filed and obtained confessions of judgment against NRO and NRO Edgartown in New York.

## DAMAGES

172. The predatory scheme commenced with a single predatory loan, which led to additional loans—one after another—to pay off the prior loans.

173.     NRO was essentially trapped by a common tactic used by these predatory lenders, which begins with a criminally usurious starter loan and ends in financial catastrophe.

174.     Defendants knew of the existence of these other disguised loans and nevertheless continued to loan monies to Plaintiffs, knowing that the proceeds of one loan would be used to pay off monies owed on another and so on and forth until NRO could no longer afford to make any further payments.

175.     For example, NRO entered into a continuous series of criminally usurious loans with numerous other MCA companies. *See* Ex. A.

176.     As a direct and proximate cause of each of the preceding loans, NRO and NRO Edgartown were forced to enter into another series of criminally usurious loans with QFC between May 18, 2015 and July 7, 2016. *See* Ex. A.

177.     As a direct and proximate cause of each of the preceding loans, NRO was forced to enter into another series of criminally usurious loans with numerous other MCA companies. *See* Ex. A.

178.     As a direct and proximate result of each of these loans, NRO paid interest in excess of the 20% maximum interest rate permitted by Massachusetts law.

179.     As a direct and proximate result of each of these loans, NRO paid also interest in excess of the 25% maximum interest rate permitted by New York law.

180.     As a direct and proximate result of each of these loans, NRO's business assets have been frozen, its employees and owners have been harassed, and NRO has had to defend numerous lawsuits as a result of certain Defendants' attempts to collect upon an unlawful debt.

181. Defendants' knowledge of the other loans and participation, directly or indirectly, in the vicious cycle of predatory lending created an indivisible injury for which Defendants are responsible.

182. As a direct and proximate result of each of these loans, NRO suffered indivisible injury through loss of goodwill, lost profits, and devaluation of its business.

183. As a direct and proximate result of each of these loans, NRO suffered indivisible injury by having its other business loans being called in from legitimate banks, deterioration of its credit profile, and the inability to secure financing to obtain needed inventory and pay its vendors.

184. As a direct and proximate result of each of these loans, Alice Indelicato has suffered indivisible injury through severe mental anguish and emotional distress.

185. In addition to being harassed by Defendants' unlawful actions, the Indelicato's have had liens placed on their residential home and have had their personal assets frozen. The Indelicato's were also forced to sell a 50% equity stake in their companies.

186. Defendants' unlawful conduct has caused tremendous "emotional and mental distress" to the individual owners of NRO because all of their personal assets, including their homestead, are at risk of seizure and foreclosure because Defendants' have extorted personal guarantees as a result of their criminally usurious loans.

187. Unfortunately, these are not mere threats; it is a nightmare turned into reality.

188. As a direct result of Defendants' unlawful conduct, NRO and its individual owners have been besieged by lawsuits in Massachusetts and other jurisdictions, resulting in personal judgments by confession (which are illegal in Massachusetts), bank accounts being frozen, and liens on their homes.

189.   As a direct and proximate result of each of these loans, the Indelicato's have also suffered an indivisible injury by having to drain all of their personal assets by providing personal and family loans to NRO in order to keep their only means of livelihood afloat.

190.   Because each of these transactions involves a criminally usurious loan, NRO is entitled to a declaration that each loan and its supporting documents are void.

191.   In addition, NRO is entitled to recover the over $5 million in criminally usurious interest that has been procured by Defendants, as well as its attorney's fees, and costs of this suit.

192.   In order to deter Defendants from committing these same crimes against future victims within this Commonwealth, Plaintiffs are also entitled to treble damages under 93A.

193.   As recognized by the Supreme Judicial Court of Massachusetts, the unscrupulous tactics employed by Defendants against Plaintiffs are exactly what the criminal usury laws were designed to prevent. *See Begelfer v. Najarian*, 409 N.E.2d 167, 171 (Mass. 1980) ("The law is designed to protect the necessitous debtor from outrageous demands by lenders.").

## COUNT I
### 18 U.S.C. § 1962

194.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

**A.   Culpable Persons**

QFC is a limited liability company capable of holding a legal interest in property and is thus a "person" within the meaning of 18 U.S.C. § 1962(c) as the term is defined by 18 U.S.C. § 1961(3).

**B.   The Association-in-Fact Enterprise**

195.   The Investor Defendants, the Frascella Brothers, and QFC are separate individuals or entities associated with each other by shared personal and/or one or more contracts or

agreements for the purpose of originating, underwriting, servicing and collecting usurious loans to the Plaintiffs and countless other small businesses throughout the United States.

196. This association of the Investor Defendants, the Frascella Brothers, and QFC constitutes a single association-in-fact enterprise (the "Lending Enterprise") within the meaning of 18 U.S.C. 1962(c), as the term is defined in 18 U.S.C. 1961(4).

197. The members of the Lending Enterprise have functioned as a continuing unit for at least the past two years.

198. The Lending Enterprise has an existence separate and apart from the illegal activity in which it engages by entering into legal financing agreements and attempting to collect lawful debts using legal collection practices.

**C.    The Defendants' distinct roles in the Enterprise.**

199. Each of the members has a distinct role in the Lending Enterprise.

200. The John and Jane Doe Investors provide capital for investment by the Lending Enterprise in lawful and unlawful loans, including the Agreements.

201. The Frascella Brothers are the masterminds of the Lending Enterprise, soliciting borrowers, including the Plaintiffs, obtaining necessary underwriting information for use by QFC in underwriting the lawful and unlawful loans and assisting the collection of the lawful and unlawful loans by obtaining the borrowers authorization to effect daily ACH withdrawals from specified bank accounts, and directed the affairs of the Lending Enterprise.

202. QFC underwrites, funds, services, and collects lawful and unlawful loans on behalf of the Lending Enterprise including the Agreements.

### D.     Engagement in Interstate Commerce

203.     The Lending Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

204.     Specifically, the members of the Lending Enterprise maintain offices in Pennsylvania and use personnel in these offices to originate, underwrite, fund, service and collect on loans made by the Lending Enterprise to borrowers- in Massachusetts and throughout the United States via the extensive use of interstate emails, telephone calls, wire transfers and bank withdrawals processed electronically through an automated clearing house.

205.     In the present case, all communications between the Lending Enterprise and Plaintiffs were by interstate email, telephone calls, wire transfers or other interstate wire communications. Specifically, the Lending Enterprise used interstate emails and telephone calls to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements, and collect the Daily Specific Amount via electronic interstate withdrawals processed through an automated clearing house. Additionally, the Lending Enterprise used interstate email communications to attempt to collect when the Plaintiffs were unable to make the daily payments under the Agreements.

### E.     Conducting Affairs through a Pattern of Racketeering.

206.     QFC conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though a pattern of racketeering activity (wire fraud) in violation of 18 U.S.C. 1962(c).

207.     Beginning no later than in or around September 2014 and continuing today, QFC devised and carried out a scheme to conduct the affairs of the Lending Enterprise to intentionally defraud borrowers in Massachusetts and throughout the United States, including the Plaintiffs, to

enter into and make payments on criminally usurious loans for which they had no legal obligation to pay and to intentionally defraud others into satisfying such loan obligations when a borrower defaulted.

208. Since QFC is a web-based company that conducts virtually all of their business through the internet, email communications, telephone calls, and wire transfers, it was reasonably foreseeable that interstate emails, telephone calls, and wire transfers would be used in furtherance of the scheme, and, in fact, intestate emails, telephone calls and wire transfers are used in furtherance of the scheme.

209. Specifically, the Frascella Brothers and the John and Jane Doe Investors directed, approved or ratified QFC' use of the internet, interstate email, telephone calls, and other communications to intentionally defraud borrowers in Massachusetts and throughout the United States, including the Plaintiffs, to enter into and make payments on criminally usurious loans for which they had no legal obligation to pay.

210. As part of this scheme, by the use of interstate emails and telephone calls, QFC targets and solicits cash-strapped businesses upon which to pawn of usurious loans funded by the John and Jane Doe Investors. These interstate emails and telephone calls intentionally create the false impression that the usurious loans are legally enforceable by:

 (i) misrepresenting the true nature of the loan transactions as receivable sales in order to avoid applicable criminal usury laws;

 (ii) falsely representing that disguised loan contracts are enforceable when they are illegal under New York and Massachusetts or other applicable law;

 (iii) advising the illegal loans would be funded through interstate wire transfers; and

 (iv) directing all loan repayments to be made by electronic interstate bank withdrawals via an automated clearing house.

211. Once the loans are approved by QFC, it furthers the scheme by using interstate wires to fund the unlawful loans and electronic interstate bank withdrawals to repay the amounts advanced under the disguised loans, all of which further create the impression that the usurious loans are legally enforceable contracts which Defendants know to be false.

212. If a borrower defaults, QFC uses interstate emails and telephone calls to once again fraudulently induce the borrowers to obtain new advances under loans funded by the John and Jane Doe Investors, QFC knowingly misrepresents the true nature of the transaction in an effort to evade applicable usury laws and create the false impression that the contracts are legally enforceable when they are not thereby inducing the borrowers to enter into and make payments on new usurious agreements to pay off the obligations under the old ones.

213. Borrowers in Massachusetts and throughout the United States, like the Plaintiffs, reasonably rely upon these knowingly false representations in order to enter into and make payments on criminally usurious loans.

214. In the present case, through a series of interstate emails beginning in 2014, QFC solicited Plaintiffs, and, upon approval provided Plaintiffs with a copy of the several Agreements which QFC asked that Plaintiffs execute, together with a form authorizing QFC to electronically withdrawal the daily payments from NRO's Bank Account. QFC' actions were intentionally designed to and, in fact did, create the impression that the Agreements were legally enforceable contracts which Defendants knew to be false.

215. QFC furthered the scheme by funding the Agreements through an interstate wire transfer and thereafter withdrawing the Daily Specific Amount due under the Agreements by electronic interstate withdrawals processed through an automated clearing house, all of which

was intentionally designed by Defendants to and, in fact did, create the impression that Agreements were legally enforceable contract which they knew to be false.

216. The scheme continued long after 2015. Whenever the Plaintiffs could no longer make the daily payments under an Agreement, QFC used similar emails and wire communications to intentionally create the false impression that each successive disguised loan was a legally enforceable contract in order to induce the Plaintiffs to enter into and make payments on the criminally usurious loans.

217. Plaintiffs reasonably relied upon these knowingly false representations to their detriment, as they executed each of the Agreements and were forced to pay interest in excess of Massachusetts' criminal usury threshold.

218. When the payments ultimately became too much and the Plaintiffs could no longer make any payments under the Agreements, QFC used interstate emails and telephone phone calls on or about February 15, 2018 to give Plaintiffs customers the impression that Defendants had an enforceable debt, and that payments due to Plaintiff should be forwarded to QFC.

219. QFC's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343 which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Lending Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**F.      Conducting Affairs Through the Collection of Unlawful Debt**

220. The Agreements between Plaintiffs and QFC constitute unlawful debt within the meaning of 18 U.S.C. 1962(c) because (1) they violate applicable criminal usury statutes, and (2) the rates are more than twice the legal rate.

221.     Upon information and belief, the rates charged by these Agreements were more than twice the criminal usury threshold of both Massachusetts and New York.

222.     QFC conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though the collection of this unlawful debt in violation of 18 U.S.C. 1962(c).

223.     Specifically, QFC obtained Plaintiffs' authorization to electronically withdrawal payments on an unlawful debt from NRO's bank accounts.

224.     Upon receipt of such authorization, QFC did, in fact, make the daily withdrawals required by the Agreements.

225.     When Plaintiffs no longer could make the daily payments required under the Agreements, QFC filed and obtained judgments by confession against Plaintiffs in New York state court on September 27, 2018.

**G.     Injury**

226.     As a direct and proximate cause of QFC's violation of 18 U.S.C. § 1962(c), Plaintiffs suffered, and continue to suffer, substantial injury to their business and/or property as Plaintiffs were forced to pay usurious amounts of interest and have lost, and will continue to lose, profits.

**COUNT II**
**Violation of 18 U.S.C. § 1962(d)**

227.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

228.     Each of the Defendants conspired in violation of 18 U.S.C. § 1962(d) to conduct or participate in the affairs of the Lending Enterprise through a pattern of racketeering activity and the collection of an unlawful debt.

229. Specifically, through emails, meetings, telephone calls or other communications, each of the Defendants were in agreement that QFC would: (i) use wire communications to falsely represent the nature of the agreements between QFC and their borrowers, including the Agreements; (ii) fraudulently induce borrowers, including the Plaintiffs, to enter into transactions such as the Agreements that disguised the true nature of the transactions in order to avoid application of criminal usury laws in Massachusetts, New York and other states; (iii) fund usurious loan transactions between QFC and their borrowers, including the Agreements, and (iv) collect or facilitate in the collection of unlawful debt, including the loans advanced to the Plaintiffs under the Agreement.

**COUNT III**
**(Mass. Gen. Law ch. 93A §§ 2 and 11)**

230. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

231. A corporate officer may be held personally liable for his "participation in unfair and deceptive practices." *Nader v. Citron*, 372 Mass. 96, 103, 360 N.E.2d 870 (1977); *The Community Builders, Inc. v. Indian Motorcycle Associates, Inc.*, 44 Mass. App. Ct. 537, 560, 692 N.E.2d 964 (1998).

232. Defendants' the Frascella Brothers participated in various unfair and deceptive acts and practices alleged through the Amended Complaint.

233. Defendants' conduct in inducing NRO to enter into the loans involved a series of consumer and commerce related transactions that substantially occurred within the Commonwealth of Massachusetts.

234. Defendants' loans to NRO were unfair and deceptive under 93A because Defendants knew or should have known that NRO ultimately would not be able to repay the

loans when the pyramid scheme finally collapsed. Accordingly, Defendants violated Mass Gen. Law ch. 93A by unconscionably making, servicing, or collecting, or attempting to collect, on loans issued to Massachusetts small businesses and individual owners without appropriate evaluation of their ability to repay the loans.

235. Defendants also engaged in unconscionable and unfair business practices by intentionally misrepresenting the true nature of the transactions in order to avoid this Commonwealth's criminal laws.

236. At all relevant times, NRO sought a loan and believed it was getting a loan.

237. Defendants actively solicited the transactions from NRO by affirmatively representing that they were providing in substance, or, in fact, a loan.

238. The brokers who negotiated most of the transactions at issue also represented to NRO that it was a receiving a loan from Defendants.

239. In addition, Defendants falsely represented the market value of the future receivables that Defendants purported to purchase. This stated value was not based on any true market value assessment but rather was a knowingly false representation unilaterally made by Defendants in order to disguise the true nature of the transactions.

240. Defendants further knowingly misrepresented the nature of the fees charged in connection with the loans. Defendants knowingly misrepresented that the fees were reasonable costs of servicing the loans when, in fact, these fees were merely additional interest charged by Defendants in consideration of making the loans.

241. Defendants also included a choice-of-law provision that represented that Pennsylvania or New York law applied to the transactions.

242. At the time these representations were made, Defendants knew that the representations were false.

243. Defendants made these representations with the intent to deceive NRO, and with the intent to avoid the criminal usury laws.

244. NRO reasonably relied upon these knowingly false representations to its detriment.

245. Defendants conspired with and acted in concert with other MCA companies to violate Mass. Gen. L. ch. 271, § 49 and N.Y. Penal Law § 190.40.

246. Defendants also violated Mass. Gen. L. ch. 231, 13A by requiring Plaintiffs to execute a confession of judgment as part of each agreement.

247. Defendants further violated Mass. Gen. L. ch. 231, 13A when QFC confessed judgment in the amount of $250,898.84 against NRO Edgartown and Alice Indelicato on or about September 27, 2016 with the Supreme Court of the State of New York, County of Westchester.

248. Defendants further violated Mass. Gen. L. ch. 231, 13A when QFC confessed judgment in the amount of $320,328.92 against NRO Boston and Alice Indelicato on or about September 27, 2016 with the Supreme Court of the State of New York, County of Westchester.

249. Defendants knew they had no right to obtain judgments by confession against NRO, which judgments totaling $571,227.76 constitute damages under 93A.

250. In attempting to collect upon the unlawful debt, Defendant also violated N.Y. C.P.L.R. 3218 by obtaining a judgment by confession against Plaintiffs through an affidavit that did not identify the county in which judgment would be entered.

251. Defendants violation of N.Y. Penal Law § 190.40, CPLR 3218, Mass. Gen. L. ch. 271, § 49 and Mass. Gen. L. ch. 231, 13A constitute per se violations of Mass. Gen. Law ch. 93A §§ 2 and 11.

252. Defendants also violated Mass Gen. Law ch. 93A §§ 2 and 11 by including unconscionable and unfair provisions in connection with its contracts of adhesion. Among these unconscionable and unfair provisions, Defendants required NRO to:

a) Waive the right to a jury trial;

b) Pay Defendants their attorney's fees;

c) Waive the right to participate in a class action;

d) Waive the right to seek legal redress in their home state;

e) Waive the right to contest the forum of any other jurisdiction Defendants unilaterally select;

f) Execute a Confession of Judgment for the full amount of debt in violation of Massachusetts law;

g) Execute a Power of Attorney;

h) Execute a Security Agreement giving Defendants a UCC lien on all of its assets;

i) Execute a personal guarantee making the individual owner of the business personally liable for any default under the agreement;

j) Indemnify Defendants against third-party claims;

k) Waive claims for direct, consequential and punitive damages; and

l) Consent to crippling default penalties and enforcement actions.

253. Defendants' conduct was willful, unfair and unlawful.

254. The Agreements are unconscionable.

255. Defendants willfully and knowingly violated Mass Gen. Law ch. 93A.

256. Plaintiffs suffered damages as a direct result of Defendants' unlawful, unfair and deceptive acts.

257. Defendants are jointly-and-severally liable for all of the damages suffered by Plaintiffs.

## COUNT IV
### (Mass. Gen. L. ch. 271, § 49 and N.Y. Penal Law § 190.40)

258. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

259. Each of the agreements entered into between NRO and QFC sets forth a collateralized loan transaction in violation of Mass. Gen. L. ch. 271, § 49 and N.Y. Penal Law § 190.40.

260. NRO and QFC intended to enter into a loan transaction for each agreement.

261. QFC knowingly charged a criminally usurious rate of interest in excess of 25% on the loans and entered into the loans with usurious intent.

262. The loans are usurious *per se*.

## COUNT V
### (Mass. Gen. L. ch. 231, 13A)

263. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

264. Each of the agreements entered into between NRO and QFC sets forth a collateralized loan transaction to which Massachusetts usury laws are applicable, and should be declared void under Mass. Gen. L. ch. 271, § 49.

265. Each of the agreements entered into between NRO and QFC is illegal to possess under Mass. Gen. L. ch. 271, § 49(b).

266.     The Confessions of Judgment that Plaintiffs were forced to execute in connection with the loans were all executed within Massachusetts, by a Massachusetts business and resident, through a Massachusetts notary public.

267.     Each of these Confessions of Judgment is thus null and void under Mass. Gen. L. ch. 231, 13A.

268.     Plaintiffs do not regularly transact business in the State of New York.

269.     Accordingly, Plaintiffs are not subject to the personal jurisdiction of the State of New York.

270.     The Judgments by Confessions obtained by QFC against NRO Boston and NRO Edgartown in the State of New York are therefore unenforceable.

### COUNT VI
(Negligence and Negligent Misrepresentation)

271.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

272.     QFC held itself out as providing financial consulting services for the purpose of assisting NRO with managing its existing debt and increasing its business cash flow.

273.     QFC represents on its website that:

"At Quick Fix Capital we know that every business is unique. No one understands your company's funding needs as well you do. *Quick Fix Capital analyzes merchant requests individually and on their own merits to offer financing that best satisfies their requirements and goals.* We are able to present business owners with more and better options than our competition." (emphasis added).

274.     In connection with these financial consulting services, QFC supplied NRO with information for their own personal gain.

275.     In providing this information, QFC represented that it was providing specialized information to NRO based on their expertise and knowledge of small business needs.

-38-

276.   In providing this information, QFC represented that each of the transactions at issue were designed to help NRO's business grow and prosper.

277.   In providing this information, QFC represented that NRO's business would be able to afford and comply with the terms and conditions of each transaction.

278.   In providing this information, QFC failed to reasonably investigate NRO's financial condition in order to reasonably assess the financial needs and capabilities of NRO.

279.   In providing this information to NRO, QFC placed its own financial gain ahead of NRO's.

280.   In providing this information to NRO, QFC intended and/or knew that the information provided would be used in the course of NRO's own business activity.

281.   In providing this information to NRO, it was reasonably foreseeable that NRO would rely upon the information provided by QFC to NRO.

282.   The information provided by QFC was false.

283.   Any reasonably prudent financial consultant would have known that the information provided by QFC was false.

284.   Any reasonably prudent financial consultant would never have advised NRO to enter into any of the transactions at issue.

285.   Any reasonably prudent financial consultant would have known that each of the transactions at issue would cause substantial financial harm to NRO's business.

286.   Any reasonably prudent financial consultant would have known that each of the transactions at issue would *not* help its business grow as promised and represented.

287.   NRO reasonably relied upon these knowingly false, misleading and/or negligent representations to its detriment.

288.   But for these false representations by QFC, NRO would not have entered into any of the transactions at issue.

289.   QFC owed a duty of care to NRO.

290.   QFC breached its duty of care to NRO by providing false, misleading and/or negligent information to NRO.

291.   NRO suffered damages as a direct result of QFC's negligent representations and/or negligent conduct.

292.   The conduct of Defendants was outrageous and Defendants acted with reckless disregard for the rights of Plaintiffs.

293.   Defendants' conduct shocks the conscience.

294.   QFC is jointly-and-severally liable for all of the damages suffered by NRO.

## COUNT VII
### (In the alternative, Contract)

295.   Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

296.   Each of the agreements entered into between NRO and QFC sets forth a collateralized loan transaction to which Massachusetts usury laws are applicable.

297.   Section 3.1 of QFC's Agreement provides that: "In the event that a court determines that QFC charged or received interest hereunder and interest is in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and QFC shall promptly refund to Merchant any interest received by QFC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that QFC not receive or contract to receive, directly or indirectly

in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law."

298.   NRO has paid and QFC has received interest in excess of the maximum civil usury interest rate of 20% that is allowed under Massachusetts law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek an order from this Court:

a) Ordering Defendants to repay NRO all principal and interest previously paid to Defendants in connection with the criminally usurious loans;

b) Granting an injunction against Defendants restraining them from enforcing any of their rights under the criminally usurious loans;

c) Awarding Plaintiffs direct and consequential damages in excess of $5 million dollars, including prejudgment interest;

d) Awarding Plaintiffs treble damages;

e) Awarding Plaintiffs punitive damages;

f) Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

g) Granting such other and further relief as this Court deems just and proper.

**WHITE AND WILLIAMS LLP**

BY: _____

Shane R. Heskin
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
Phone: 215.864.7165
Attorneys for Plaintiffs

Dated: June 22, 2018

20484667v.1

## CERTIFICATE OF SERVICE

I, Shane R. Heskin, Esq., hereby certify that a true and correct copy of Second Amended

Complaint was served to all counsel of record on June 22, 2018, via the Court's ECF system.


**WHITE AND WILLIAMS LLP**


BY:    /s/ Shane R. Heskin
        Shane R. Heskin, Esquire

**Dated:** June 22, 2018